# ST. LOUIS GUNNING ADVERTISING COMPANY v. CITY OF ST. LOUIS et al., Appellants.

### In Banc, June 7, 1911.

1. **CITIES: Charter Powers to Regulate or Suppress Billboards.** A charter provision authorizing the city "to license, tax and regulate all other business, trade, avocations or professions whatsoever," and "to license, tax, regulate or suppress all occupations, professions and trades not heretofore enumerated, of whatever name or character," invests the municipal assembly with power to enact reasonable ordinances for licensing and regulating the construction of billboards on vacant lots, and even to suppress them entirely if in character they become a nuisance *per se.* The construction of billboards for advertisement purposes is a business.

2. ———: ———: **General Welfare Clause.** Likewise the general welfare clause of the charter, authorizing the city "to pass all such ordinances, not inconsistent with this charter, in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufacturers, and to enforce the same by fines and penalties," invests the city with such power. It cannot be gainsaid that ordinances regulating the construction of billboards on vacant lots are necessary to maintain the peace, good government, health and welfare of the city.

3. ———: ———: **General Provision.** It is not necessary that the charter contain an express authority authorizing the city to enact ordinances regulating the construction of billboards by name. A general provision clearly embracing the authority to enact them is sufficient. .

4. ———: **Bill Boards: Reasonable Regulation: Nuisances: Aesthetic Purposes: Confiscation.** An ordinance declaring that "no billboard hereafter erected, altered, refaced or recon-

structed shall exceed fourteen feet in height above the ground, and every such billboard shall have an open space of at least four feet between the lower edge and the ground, which space shall not be closed in any manner while the billboard stands; nor shall any such billboard approach nearer than six feet to any building, nor to the side line of any lot, nor nearer than two feet of any other billboard, nor shall any such bill-board exceed five hundred square feet in area, nor approach the street line on any street on which any lot fronts nearer than fifteen feet; and where buildings are hereafter built near or adjacent to billboards such billboards shall be so moved or cut off as to leave a space of not less than six feet between the building and such bill-board," is a reasonable police regulation, in the interest of the public health, safety, peace and morals; for, (1) the requirements for a distance of fifteen feet between the street and billboard and the restriction of its height to fourteen feet are in the interest of the safety of travelers on the street in case the billboard falls or is blown down; (2) the space of four feet between the lower edge and the ground affords a larger resistance to winds and is therefore in the interest of the public safety, prevents the accumulation of weeds and inflammable matter and is therefore a precaution against fire, and tends to lessen the billboard as a protection and hiding place for highwaymen and other offenders against decency and morality; and (3) the intervening space of six feet between the billboard and another building or the edge of the lot affords an escape for strong winds and tends to destroy the space behind it as a place of concealment.

Held, by GRAVES, J., dissenting, that the purpose of the ordinance is to restrict the use of private property in deference to aesthetic tastes and purposes, and that such is its purpose and that it strikes at the use of the billboard rather than its character is shown by the language of the ordinance itself which defines billboards to be "all structures, of whatever material, erected, maintained or used for the public display of posters, painted signs, pictures," etc.; that the police power is not broad enough to authorize restrictions upon the use and enjoyment of private property based wholly or primarily upon aesthetic considerations; that the city can regulate the height of billboards, can specify methods of constructing, can prescribe that the lower edge be a certain distance from the ground, and that it is not to be constructed of inflammable material, but it has no power to say a billboard cannot be constructed nearer than fifteen feet of the building line of the lot, for that is not required by any consideration of public safety or necessity, and is a confiscation of private property; that the arbitrary interference by government

with the reasonable enjoyment of private land is the taking of private property without due process of law, and violative of the Constitution; and that the ordinances show on their face that they are aimed at the pictures on the boards rather than the boards themselves, and are not an honest attempt to exercise the police power for public safety, public health or public morals. Nor are the .billboards responsible for the nuisances committed behind them; putting them to advertising purposes is not the inducing cause of the nuisances, and if nuisances are committed there the city has the power to abate them, and to punish the wrongdoers.

5. ——: ——: ——: **Taking Private Property.** Nor does the fact that such ordinance and restrictions in an indirect way amount to lessening the remunerative value and income from lots on which billboards are already or may hereafter be erected, render the ordinance invalid. If nuisances cannot be abated in any other way than by ordinances regulating the construction of structures which invite and induce their commission. then the police power of the State is ample to warrant that regulation without infringing upon any constitutional right of the lot owner or the man who constructs the structures for advertisement purposes. Even though the enforcement of an ordinance seriously impairs the value of the lot owner or the advertiser for advertising purposes, or greatly restricts the advertiser's business, yet if a less restricted use becomes a nuisance to the community, impairing the public safety, producing dangers to travelers on the street, increasing the probability of fires, and affording protection and a place of concealment to highwaymen and offenders. against decency and morality, the city has the authority to enact the ordinance. Such an ordinance does not amount to taking private property for public use. It does not deprive the owner of the lot or his licensee of its use; it simply regulates a particular use, and says that such use must not contravene the public safety, health and security.

*Held,* by GRAVES, J., dissenting, that an ordinance that arbitrarily says that no billboard shall be erected within fifteen feet of the building line of the lot is the taking of private property for public use without due process of law and without just compensation, is not in the interest of public safety, is confiscatory, and is violative of both the State and Federal Constitution.

6. ——: ——: ——: **Unreasonableness Not Shown: Prima Facie Valid.** A police regulation which the city has charter authority by ordinance to make must be held valid by the court, unless its unreasonableness appears upon the face of

the ordinance itself or the evidence produced clearly shows it is in fact unreasonable.

7. ———: ———: **Due Process of Law.** Nor does the ordinance declaring that a billboard shall not be above fourteen feet high, nor its lower edge come closer than four feet of the ground, nor be erected nearer than fifteen feet of the front building line of the lot, nor nearer than six feet of the side line of the lot, etc., deprive the lot owner or the owner of the billboard of his property without due process of law. [GRAVES, J., dissenting.]

8. ———: ———: **Equal Protection of Laws.** Such an ordinance embraces within its provisions all billboards to be erected with the city limits, and is not therefore class legislation, and does not discriminate against an owner of many billboards and does not deny him the equal protection of the laws. [GRAVES, J., dissenting.]

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

REVERSED.

*Lambert E. Walther* and *Charles P. Williams* for appellants.

(1) Judicial authority to declare a police ordinance void on the ground of unreasonableness is to be very cautiously exercised. McQuillin on Ordinances, p. 298; State v. Clifford, 128 S. W. 758; Wells v. Mt. Olivet, 102 S. W. 1182. All rights of every character are held subject to the police power. St. Louis v. McCann, 157 Mo. 308; Eichenlaub v. St. Joseph, 113 Mo. 404; St. Louis v. Galt, 179 Mo. 16. The Legislature is the judge in the first instance of expediency, and its decision must be prima facie presumed to be correct. The decision of the Legislature as to the existence of the evil, and of the necessity for remedy, must, under evidence that is conflicting, be presumed conclusively to have been correct. State v. Layton, 160 Mo. 498. (2) In the exercise of charter-powers specifically granted, courts will not ordinarily inquire

into the reasonableness of the ordinance. Morse v. Westport, 110 Mo. 502; Skinker v. Heman, 148. Mo. 355; Prior v. Construction Co., 170 Mo. 439; St. Charles v. Elsner, 155 Mo. 671. (3) There is no showing whatever that the ordinances were intended to be, or in fact are, discriminatory against plaintiff. (4) The various charter-provisions to which various regulations may be referred: Art. III, sec. 26, cl. 5; St. Louis v. Bowler, 94 Mo. 633; St. Louis v. Fischer, 167 Mo. 662; Hill v. St. Louis, 159 Mo. 171; Art. III, sec. 26, cl. 6, cl. 14, cl. 12. (5) The billboard cases set out and briefly discussed: City of Rochester v. West, 164 N. Y. 510; In re Wilshire, 103 Fed. 620; Gunning System v. Buffalo, 75 N. Y. App. 31; Rideout v. Knox, 148 Mass. 368; Whitmeier & Filbrick Co. v. Buffalo, 118 Fed. 773; Commonwealth v. Boston Advertising Co., 188 Mass. 348; People v. Green, 83 N. Y. Supp. 460; Bostock v. Sands, 52 Atl. (Md.) 65; Chicago v. Gunning System, 214 Ill. 628; Bill Posting Co. v. Atlantic City, 58 Atl. (N. J.) 342; Crawford v. Topeka, 51 Kas. 756; Passaic v. Patterson Bill Posting Co., 62 Atl. (N. J.) 267; Hill v. St. Louis, 116 Mo. 527. (6) The definition clause in section 177 does not invalidate. (7) The court takes judicial notice of the general conduct of business. Wiggins Ferry Co. v. Railroad, 5 Mo. App. 375; Denegre v. Walker, 114 Ill. App. 234; Gunning System v. Chicago, 214 Ill. 640; Gas Company v. Lattler, 162 Ind. 320; State v. Gas Co., 163 Ind. 48; Smith v. Railroad, 114 Mich. 460.

*Bishop & Cobbs* for respondent.

(1) The charter of the city of St. Louis gives no express authority for the enactment of the ordinances in question. Par. 5, sec. 26, Art. 3, gives only power to license and regulate occupations, trades, etc. It gives no authority to prescribe the location, height, etc., of signs and billboards. Par. 6, sec. 26, art. 3,

gives only power to abate nuisances. Signs and bill-boards are not nuisances *per se*. The restrictions in these ordinances are not directed against nuisances at all, and cannot be justified on that ground. City of St. Louis v. Heitzeberger Packing Co., 141 Mo. 383; Yates v. Milwaukee, 10 Wall. 497; Crawford v. Topeka, 51 Kas. 762; Bryan v. Chester, 212 Pa. 259. Par. 14, sec. 26, art. 3, the "General Welfare" provision, gives the city authority to enact only such reasonable regulations as are necessary to maintain the peace, health, safety and moral welfare of the community. It contains no express authority to enact these ordinances. It is only a statement of the general police power. (2) There being no express authority to enact these ordinances, there is no presumption in favor of their validity. In fact, the burden is rather on the city to justify their provisions, under its general police power. State v. Butler, 178 Mo. 272; Scott v. People, 89 Ill. 197. (3) The test of the right to exercise the police power is necessity. The test of the method of exercising it is reasonableness. Unless, therefore, the city can justify the provisions of these ordinances by these tests, it is the duty of the court to declare them void. The city is limited strictly to the enactment of only such reasonable regulations as are necessary for the maintenance of the peace, health, safety or moral welfare of the community. Williamson v. Commonwealth, 90 Pa. St. 498; T. W. & W. R. W. Co. v. Jacksonville, 67 Ill. 40; Fisher Co. v. Woods, 187 N. Y. 90; Ritchie v. People, 155 Ill. 110; Ruhstrat v. People, 185 Ill. 133. (4) Neither of the ordinances involved here meets the tests of necessity and reasonableness and all of them are discriminative. Not one of the sections involved can be justified as a reasonable and necessary measure for maintaining either the peace, the health, the safety or the moral welfare of the community. The prohibitions, restrictions, and provisions of each sec-

tion are so unnecessary, so unreasonable and so discriminative, that a mere statement of them reveals their invalidity.   1.   Section 14 requires the payment of a permit fee of only one dollar for the erection of a structure, the cost of which does not exceed $1000. That is reasonable and fair.   But if that same structure is used for displaying "pictorial or reading matter," a permit fee of $200 may be required.   That is unreasonable, unnecessary   and   discriminative.   2. Section 81, makes a "sign" of any structure "erected on the top of any building or attached to the walls of any building" which is used for the public display of "pictorial or reading matter."   If not so used, such structures are not subjected to the restrictions of this section.   That is unjust classification and is discrimination.   This section is also unnecessary and unreasonable in its provisions.   1st.   As to existing signs. It requires the unnecessary destruction of all structures erected on the top or attached to the walls of any building, which are used for the public display of "pictorial or reading matter," and which may become rotten or unsafe.   The right to repair and make safe is denied absolutely.   The structure is condemned because of the way in which it is painted or papered.   If the "pictorial or reading matter" is removed, then, under section 2, a permit to repair may be obtained.   Neither peace, morals nor health is involved.   Destruction is not necessary to safety.   Discrimination is apparent.   2d.   As to new signs.   a. It requires all new structures, "attached to any building," which are used for displaying "pictorial or reading matter," to the extent of more than $3\frac{1}{2}$x10 feet in area, to be "constructed wholly of metal or other non-combustible material."   This is an arbitrary requirement without regard to the location or character of the building to which it is attached.   Other structures, such as balconies, porches, awnings, etc., not

painted or papered with "pictorial or reading mat-ter," may be attached to any building, if constructed of material satisfactory to the commissioner, or suit-able to the building to which they are attached. This is discrimination. Non-combustible material is un-necessary in some places and on some buildings. b. It requires all new structures, "erected on any build-ing," which are used for displaying "pictorial or reading matter," to be "supported upon heavy iron braces bolted to the walls or roofs of the building in a firm and secure manner." Other structures, such as towers, tanks, etc., on which no "pictorial or read-ing matter" is displayed, may be erected on any build-ing without being so supported, provided they are made safe. The safety of these structures is the ulti-mate test, and that is determined by the location, size and character of the structure itself. This general arbitrary requirement is discriminative and is un-necessary. 3. Section 177, makes the term "bill-board" to include "all structures of whatever ma-terial the same may be constructed, which are erected, maintained or used for the public display of posters, painted signs, pictures or other pictorial or reading matter," except those structures covered by section 81—the signs. This definition alone condemns the ordinance. If a fence, a shed, a barn, a store, a resi-dence, or any other structure is used to display "pic-torial or reading matter" of any kind, it becomes a "billboard," and is subjected to unreasonable restric-tions which are not imposed on such structures if not so used. This is rank discrimination. Besides its provisions are so unreasonable and so unnecessary for either peace, morals, health or safety, that they vio-late every test of justification. 1st. It prohibits the erection or alteration of any structure used to display "pictorial or reading matter," more than fourteen feet in height. 2d. It requires an open space of four feet between each such structure and the ground.

3d. It prohibits any such structure within six feet of any other building, and requires that it be cut off or moved, if a building is erected within six feet of it. 4th. It prohibits any such structure within six feet of the side line of any lot. 5th. It prohibits any such structure within two feet of another such structure. 6th. It limits each such structure to a surface area of 500 square feet. 7th. It prohibits any such structure within 15 feet of any street, alley or right of way. 8th. If the building line of any building, within fifty feet of any such structure, is more than fifteen feet from the street or lot boundary line, then no such structure is permitted nearer the street or lot boundary line than that building line. 9th. It prohibits repairing any such structure, unless all of above restrictions are complied with. These restrictions are made to apply to all such structures without regard to their location in the city, their character or the safety of their construction. (5) Even if the charter had given express authority to enact these very ordinances they and the charter provisions authorizing them would be void. They contain such restrictions on the use of private property as constitute a "taking" of that property in violation of our organic laws. They deprive respondent of its property without due process of law. They discriminate against respondent and deny to it the equal protection of the laws. Constitution of Missouri, art. 2, secs. 20, 21 and 30; Constitution of the United States, amendment 14; St. Louis v. Hill, 116 Mo. 527; Mugler v. Kansas, 123 U. S. 661; Austin v. Murray, 16 Pick. (33 Mass.) 126; Gaines v. Buford, 1 Dana (Ky.) 481; Wright v. Hart, 182 N. Y. 300; People v. Green, 85 N. Y. App. 400. (6) The billboard cases cited by counsel in support of their contention, do not justify any of thes ordinances. City of Rochester v. West, 164 N. Y. 510; In re Wilshire, 103 Fed. 620; Gunning System v. Buffalo, 75 N. Y. App. 31; Rideout v. Knox, 148

Mass. 368; Whitmier & Filbrick Co. v. Buffalo, 118 Fed. 773. (7) The decisions, in other jurisdictions where similar ordinances were involved, uniformly hold such ordinances void. City of Chicago v. Gunning, 214 Ill. 628; Commonwealth v. Boston Adv. Co., 188 Mass. 348; People v. Green, 85 N. Y. App. 400, 83 N. Y. Supp. 460; Bostock v. Sands, 95 Md. 400; Bill Posting Sign Co. v. Atlantic City, 71 N. J. L. 72; Crawford v. Topeka, 51 Kas. 756; Passaic v. Patterson B. P. Co., 72 N. J. L. 285; State v. Whitlock, 149 N. C. 542; Western Co. v. Knickerbocker Co., 103 Cal. 111; Varney & Green v. Williams, 100 Pac. (Cal.) 867; Bryan v. Chester, 212 Pa. St. 256; People v. Murphy, 195 N. Y. 126. (8) The upholding of such ordinances would not only deprive respondent of its property, but would subject every citizen to the despotic will of the city.

## IN DIVISION ONE.

WOODSON, J.—The purpose of this suit was to test the validity of a certain ordinance, enacted by the Municipal Assembly of the city of St. Louis, in so far as it purports to regulate and control signs and billboards within the limits thereof, and to enjoin the city and its officers from enforcing it against the plaintiff. Said ordinance is numbered 22,022, and the parts thereof which are challenged by this suit are sections 2, 14, 81, 177 and 178. Said sections read as follows:

"Section 2. Permit Required. No work, except minor repairs, shall be done upon any structure, building or shed in the city of St. Louis without a permit from the Commissioner of Public Buildings. Before proceeding with the erection, enlargement, alteration, repair or removal of any building in the city, a permit for such erection, enlargement, alteration, repair or

removal shall first be obtained by the owner or his agent from the Commissioner of Public Buildings, and it shall be unlawful to proceed with the erection, enlargement, alteration, repair or removal of buildings or of any structural part thereof, or of any structure which is to be used for the support, shelter or enclosure of persons, animals or chattels within the city, unless such permit shall first have been obtained from the Commissioner of Public Buildings.

"Section 14. Cost of Permits. The fee to be paid for a permit for the erection or alteration of buildings shall be one dollar, if the estimated cost of said building or buildings, or alteration, shall be less than one thousand dollars; and for every additional one thousand dollars of cost, or fraction thereof, the further sum of fity cents shall be paid. If it should appear to the Commissioner of Public Buildings, during the erection of any building or buildings for which a permit has been issued, that the cost of said building is in excess of the amount stated in the original application, the Commissioner of Public Buildings shall have the right to re-estimate the cost of any such building or buildings, and require the owner of said building or buildings to pay an additional fee, so that the fee paid shall conform to the entire cost of said building or buildings, as provided for in this section. The fee to be paid for a permit to remove a building shall be one dollar if the building covers twenty-five hundred square feet or less of area, and the further sum of fifty cents shall be paid for every additional twenty-five hundred square feet of area or part thereof. The fee to be paid for a permit to erect signs, as provided in section eighty-one of this ordinance, shall be at the rate of one dollar for every twenty-five square feet of area of such sign, or portion thereof. Each such permit shall state thereon the number and size of signs permitted thereby, and the street and number of the premises whereon they are to be placed.

The fee to be paid for a permit to erect billboards, shall be at the rate of one dollar for every five lineal feet thereof, and each such permit shall state thereon the length of billboards permitted thereby, and the street and number of the premises whereon they are to be erected, and their distance from the line of the street. The fee to be paid for a permit to erect or install any heating or power apparatus, as required in sections one hundred and nine and one hundred and ten shall be one dollar for every such apparatus.

"Section 81. Signs. Any signs now erected, or that may be hereafter erected, on the top of any building, or attached to the walls of any building, and that may become rotten or unsafe, shall be taken down and removed upon notice so to do from the Commissioner of Public Buildings. No sign exceeding twenty square feet in size shall hereafter be erected on any building without a permit from the Commissioner of Public Buildings, as provided in sections two and fourteen of this ordinance. No sign exceeding three and one-half feet in width, or ten feet in height, shall hereafter be attached to any building, unless such sign is constructed wholly of metal or other non-combustible material. When two or more signs are placed on any building, one above another, the width or height of the signs shall be measured as if there were but one sign, and the spaces between the signs shall be included in the width of the signs, unless there be a clear space of at least six feet between the signs. No sign shall hereafter project more than eighteen inches over the building line of any street or alley, nor shall any projecting sign be placed nearer than eight feet to the ground or pavement of any street or alley; nor shall any sign be so placed as to obstruct any fire escape, or interfere with the operations of the fire department. Every sign hereafter erected on any building, shall be supported upon heavy iron braces bolted to the walls or roofs of the building in a firm and se-

cure manner; and it shall be unlawful for any person, firm or corporation to erect or cause to be erected any sign in violation of this section.

"Section 177. BILLBOARDS. Hereafter no billboard having twenty-five square feet or more of surface shall be erected, altered, refaced or reconstructed without a permit from the Commissioner of Public buildings, and the manner of construction, location and dimensions of such billboards shall be subject to the approval of the Commissioner of Public Buildings, in accordance with the provisions of this section. The term "billboard" within the meaning of this section shall include all structures of whatever material the same may be constructed, which are erected, maintained or used for the public display of posters, painted signs, pictures or other pictorial or reading matter, except that the term "billboard" shall not be applied to such signs as are attached to the roofs or walls of buildings, as provided for in section eighty-one of this ordinance. No billboard hereafter erected, altered, refaced or reconstructed shall exceed fourteen feet in height above the ground, and every such billboard shall have an open space of at least four feet between the lower edge and the ground, which space shall not be closed in any manner while the billboard stands; nor shall any such billboard approach nearer than six feet to any building, nor to the side line of any lot, nor nearer than two feet to any other billboard, nor shall any such billboard exceed five hundred square feet in area, nor approach the street line on any street, alley or right of way on which any lot fronts or abuts, nearer than fifteen feet, but in all cases where the building line of buildings within fifty feet of the proposed billboard is more than fifteen feet from the street line or boundary line then such billboard shall not approach nearer to such street line or lot boundary line than the distance that the building line of such buildings is from such street line or lot

boundary line; and where buildings are hereafter built near or adjacent to billboards such billboards shall be so moved or cut off as to leave a space of not less than six feet between the building and such billboard, which shall in all other respects also comply with the terms of this section. Any billboard which may now be or hereafter become rotten or unsafe and any billboard which shall hereafter be erected, altered, refaced or reconstructed, contrary to the provisions of this section or any of them, shall be removed or otherwise properly secured in accordance with the terms of this section by the owner thereof, or by the owner of the ground on which such billboard shall stand, upon receipt of proper notice so to do, as provided in section one hundred and seventy-nine of this ordinance, for the removal of unsafe structures, and no rotten or unsafe billboards shall be repaired or rebuilt except in accordance with the provisions of this sections, and upon a permit issued from the Commissioner of Public Buildings.

"Section 178. No fence, screen or structure in the nature of a fence which exceeds six feet in height shall hereafter be erected in the city of St. Louis unless the same is so constructed that the surface thereof is at regular intervals and in a uniform manner penetrated with openings, or latticed to the extent of at least fifty per cent of the area thereof, provided, however, that this section shall not apply to fences constructed wholly of brick or stone.

"It shall be unlawful to erect or maintain any fence, screen, or other structure in the nature of a fence or screen exceeding eight feet in height above the ground unless such fence be constructed wholly of brick, metal, or other non-combustible material."

The petition set out these ordinances in full, stated reasons for their invalidity, and alleged facts entitling plaintiff to the relief sought.

The answer of defendants admitted certain allegations of the petition and denied others.

On a preliminary hearing, defendants filed affidavits in support of their contention, and plaintiff filed counter affidavits.

On final hearing, the case was submitted to the court below on the following:

## STIPULATION.

"It is hereby stipulated and agreed by and between the parties to the above entitled cause, that the same may be submitted to the court for final determination, on the petition, answer and affidavits now on file herein, without the taking of other evidence, but with the understanding and agreement that the defendants admit that the plaintiff has been and will be injured and damaged by the enforcement of each provision of the ordinances set out in the petition, and that the plaintiff is in a position and has the right to question the validity of said ordinances in the manner in which their validity has been questioned in this suit.

"It is the purpose of this stipulation:

"First, to concede to the plaintiff the right, in this suit and in this manner, to test the validity of each provision of said ordinances.

"Second, to waive all formal proof, and to submit to the court the entire matter on the one and only legal question as to whether or not said ordinances are valid as a proper exercise of the charter or general police power of the city.

"Dated this 10th day of October, 1906."

Then follows the signatures of the attorneys of the respective parties to the suit.

This trial took a somewhat unusual course, in that the court heard evidence as to the necessity for the enactment of the ordinances in question, and as

to the existence or non-existence of the evils which they were designed to abate.

The evidence of the case, under the stipulation before set out, consisted of the petition, answer and the affidavits filed in the cause by the plaintiff and defendants; and it is necessary for a proper consideration of the cause that we have the pleadings and evidence before us; and as they cannot be materially abridged, we copy them in full.

### PETITION.

The petition was as follows:

(Formal parts omitted):

"Plaintiff states that it is and at all times mentioned herein has been a corporation, duly organized and existing under the laws of the State of Missouri; that the defendant, the city of St. Louis, is a municipal corporation, organized and existing under and by virtue of a scheme and charter adopted in August, 1876; that the defendant, Rolla Wells, is mayor of the city of St. Louis; that the defendant James A. Smith, is Commissioner of Public Buildings for the city of St. Louis; that the defendant, Christopher G. Gillaspy, is Acting Chief of Police for the city of St. Louis.

"Plaintiff further states that it is engaged in the business of signpainting, billposting, and general advertising; that it has erected and now maintains a large number of billboards and signs, upon vacant property and upon buildings situated in all parts of the city of St. Louis; that at the present time it owns, leases and uses more than six hundred signs and billboards, within the limits of the city of St. Louis; that the total surface of the boards owned or controlled by plaintiff amounts to about 360,000 square feet; that all of said boards and signs are built and constructed in a safe, substantial and workmanlike manner, so that the same do not

menace or endanger, in any way whatsoever, the safety of any persons whose business may require them to pass by or in close proximity to any of said boards; that none of said billboards or signs are constructed upon any public streets, but are constructed upon lots adjoining said public streets and alleys; that plaintiff has not painted or posted, or permitted to be painted or posted, upon any of said boards or signs, any advertisement or other matter which could in any manner whatsoever be injurious to the morals of any person or citizen of the city of St. Louis; that plaintiff has expended large sums of money in procuring leases from the several owners of lots upon which said billboards are erected, and in procuring permission to erect signs on buildings where it has placed such signs; that said leases and contracts run from three to five years in length of time; that plaintiff has expended large sums of money in erecting said billboards and signs, and in maintaining the same in a safe and substantial manner; that plaintiff's business is a legal one, and does not, in any manner, conflict with any law of the State of Missouri; that plaintiff has from time to time made numerous contracts with customers, which said contracts run from six months to three years; that plaintiff by these contracts is obliged to maintain upon said billboards and signs within the city of St. Louis the advertisement of such customers, and the income of plaintiff is derived solely from the payments which said customers make to plaintiff for erecting, posting, or painting of their advertisement, and maintaining the same for the length of time required by said contracts.

"Plaintiff further states that on or about the 7th day of April, 1905, the Municipal Assembly passed, or attempted to pass, an ordinance numbered 22022, which said ordinance, among other things, further attempted to limit and regulate the erection of signs and billboards within the limits of the city of St. Louis,

the provisions of which said ordinance, applicable to plaintiff's business, are as follows, to-wit:"

Then follows a copy of said sections of said ordinance as hereinbefore mentioned.

"Plaintiff states that said ordinances, or pretended ordinances, are wholly void, for the following reasons, among others:

"First: The Municipal Assembly has no authority or power in law to make such regulations as are contained in said ordinances, and has no power or authority to thus deprive the owners and lessees of private property of the free and reasonable use of the same.

"Second: The provisions of said ordinances are unreasonable, unjust and oppressive, and go far beyond the regulations necessary for the protection of the lives, morals and property of the citizens of St. Louis.

"Third: Said ordinances are not uniform in their operation upon all classes to which they apply, but discriminate against structures erected for advertising purposes.

"Fourth: Said ordinances undertake to enforce the same limitations and regulations in the open and unsettled parts of the city as in the downtown and thickly settled sections.

"Fifth: Said ordinances, as interpreted by the Commissioner of Public Buildings, prohibit the plaintiff from making reasonable and necessary repairs on the signs and billboards heretofore erected, and thus relieve itself from great loss and from prospective liability for damages which might arise by reason of injuries caused by boards that become unsafe.

"Sixth: Said ordinances, if enforced, would deprive the owners and lessees of private property within the limits of St. Louis of the lawful and reasonable use of that part of said property which lies within fifteen feet of any public street or within six feet

of any building, without any compensation or necessity whatever.

"Seventh: Said ordinances arbitrarily and unreasonably limit the height and size of billboards, without regard to the location or the surrounding conditions.

"Eighth: Said ordinances attempt to prescribe an unjust, unreasonable and oppressive fee to be paid for permits to erect signs and billboards within the city of St. Louis, and said fees are far in excess of the fees charged for the permits for any other structure or buildings.

"Ninth: Said ordinances attempt to prescribe the kind of material out of which signs of certain dimensions shall be constructed, without regard to the requirements of the location and surroundings of said signs.

"Tenth: Said ordinances are evidently designed to discriminate against the lawful business in which plaintiff is engaged, and were evidently designed to ultimately deprive plaintiff and all others engaged in the same business of their present plant and to drive them entirely out of business in the city of St. Louis.

"Plaintiff further states that the billboards and signs heretofore constructed by it have been constructed in accordance with licenses or permits issued by the duly authorized agents of the city of St. Louis, and that it has paid to the city of St. Louis for said permits and licenses, approximately, the sum of $5000; that a large number of the billboards and signs now owned and maintained by the plaintiff are badly in need of repair and improvements; that many of them are old and are becoming unsafe and dangerous, and in order to protect the plaintiff from liability for damage, it is necessary that they should be repaired and strengthened; that repeated attempts have been made to repair said boards, but the Commissioner of Public Buildings has not only refused permits but has

actually prohibited plaintiff from making any such repairs; that said Commissioner of Public Buildings has notified plaintiff to tear down many of said boards, and has indicated an intention to enforce the said ordinances as they now stand, and to ultimately require plaintiff to tear down all of the boards and reconstruct them in accordance with the present provisions of said ordinances; that in order to tear down and reconstruct all of said billboards and signs, in accordance with the requirements of said ordinances, plaintiff would be compelled to pay to the city of St. Louis, in fees for permits within the next two years, a sum aggregating about $4,000; that it would also be compelled to tear down and destroy most of the boards which it has heretofore constructed, and to rebuild the same at great expense and great loss; that in rebuilding in accordance with the provisions of said ordinances, the total number of square feet of space now used by plaintiff would be reduced about 35 per cent to 40 per cent; that besides this great loss and shrinkage, many of plaintiff's contracts would be entirely forfeited and cancelled, and plaintiff subjected to heavy damages for not fulfilling them; and in addition, plaintiff would be required also to pay the same ground rental to the property-owners that it has heretofore paid; that it is therefore impossible for plaintiff to comply with the said ordinances and continue in business; that if said ordinances are upheld and enforced, plaintiff will be prevented from increasing its business in the city of St. Louis, and will be deprived of what business and property it now has, without compensation therefor.

"Plaintiff further states that since the passage of the last ordinance above mentioned, plaintiff has been practically prohibited from building new signs and billboards, and from repairing and improving its

old ones; that it is impossible for plaintiff to comply with the provisions of said ordinances and carry out contracts which it has already made, and carry on the lawful business in which it is now engaged; that the defendants are threatening and harassing plaintiff, and are depriving plaintiff of the lawful use of its property and preventing plaintiff from exercising those rights to which it is in law entitled.

"Plaintiff further says that since the adoption of said ordinances, it has made application to the Commissioner of Public Buildings for permits to erect many new billboards and signs, and in said applications has agreed to comply with any and all reasonable regulations and requirements; but the said Commissioner of Public Buildings has persistently refused to issue permits to erect any billboards or signs, unless the same should be constructed strictly in accordance with the provisions of said ordinances, and has demanded from plaintiff the full amount of fees provided for in said ordinances; that on or about the 4th day of May, 1906, plaintiff presented to said Commissioner of Public Buildings a number of applications for permits to erect new signs and billboards, and to repair and rebuild old ones, within the city of St. Louis, and in said applications agreed to build, repair and reconstruct said signs and billboards in accordance with all reasonable and proper regulations; but the said Commissioner of Public Buildings refused to issue permits on any of said applications, and assigned as his reason for so doing that "none of said applications are made out in compliance with the ordinance, and boards erected under conditions set out in these applications would be in direct violation of the ordinance applying to the erection of billboards and signs;" that on the 5th day of May, 1906, Messrs. Bishop & Cobbs, as attorneys for plaintiff, wrote said Commissioner of Public Buildings, and inquired as to what ordinance was referred to in his letter declining

to issue said permits; that on May 7, 1906, said Commissioner of Public Buildings replied to said letter as follows:

Messrs. Bishop & Cobbs,
        St. Louis, Mo.

Gentlemen: Yours of the 5th inst., making inquiry regarding the ordinance under which I declined to issue permits to erect, repair and rebuild signs and billboards at various locations in the city of St. Louis upon applications filed in my office by the St. Louis Gunning Advertising Company, has been received.

In reply, permit to say that in my letter of the 4th inst. I referred to sections 81, 177, 178 and 179 of Ordinance No. 22022, which was passed by the Municipal Assembly and approved by the Mayor on the 7th day of April, 1906. All notices sent to your client by this office have been sent under and by virtue of these sections of the ordinance. All fees demanded for permits from your client have been demanded in accordance with section 14 of the same ordinance, a copy of which I send you herewith.

It is my duty as Commissioner of Public Buildings to see that the sections above referred to are strictly enforced, and I shall do everything in my power to enforce them without fear or favor.

                              Respectfully,
                                    JAS. A. SMITH,
                              Commissioner of Public Buildings.

"Among the applications for permits above mentioned, was an application for permit to build a frame billboard at No. 1222-1236 North Broadway, on the lot formerly occupied by what was known as the 'Round Top Market;' that said lot is bounded on the south by a vacant lot about 175 feet long, on the west by Broadway, on the north by O'Fallon Street, and on the east by Third Street; that said lot lies at the junction of Third Street and Broadway, and is only about twenty feet wide; that there are no buildings near said lot, except those situated on the west side and entirely across Broadway; that said lot, being only about twenty feet wide, and being bounded on each side by a public street, it is impossible to construct a billboard on said lot which is not closer than fifteen feet to the street line. It is therefore impossible to comply with the ordinances above mentioned, in that particular.

Inasmuch as said lot is not near any other building or structure, the height of billboard to be erected on said lot could not be reasonably limited to fourteen feet; and although the plaintiff, in its application for permit to build on this lot, proposed to build said billboard in a safe and secure and reasonable manner, the said Commissioner of Public Buildings refused to issue said permit, and when plaintiff undertook to erect said billboard in a reasonable and safe manner, the Commissioner of Public Buildings notified plaintiff to cease said work, and the inspectors from his office required plaintiff to remove such boards of said structure as plaintiff has already put up, and called a police officer, who threatened the agents and servants of plaintiff with arrest, unless they immediately stopped said work and removed the parts which had already been placed.

"Among the said applications was also an application for a permit to repair a billboard built heretofore in accordance with the ordinances then in effect, at No. 1313-1329 Washington Avenue. Said billboard is located on the street line of Washington Avenue, and there pass along the sidewalk each day a large number of persons; said billboard is old and unsafe, and is badly in need of repair. Plaintiff is in constant danger of being subjected to liability by reason of injuries that might be caused by the falling of said board. Innocent persons passing along by it might, at any time, be injured, and plaintiff in this application to the Commissioner of Public Buildings, asked leave to repair said billboard and put the same in a safe and secure condition, but the Commissioner of Public Buildings refused to issue said permit, and when plaintiff sent its agents and servants to repair said billboard and put the same in a safe condition, the inspectors from the office of the Commissioner of Public Buildings notified said plaintiff to cease making said repairs, and ordered plaintiff's agent away

from said work. Said inspectors even called a sergeant of police, and threatened to arrest plaintiff's agents and servants, if they did not stop the work and remove the work which they had already begun.

"Plaintiff further says that said Commissioner of Public Buildings, in his efforts to strictly enforce all of the provisions of said ordinances, has served notice on plaintiff to repair many of the billboards and signs which it has heretofore erected; that when plaintiff applies for a permit to make such repairs, said permit is refused, and if plaintiff undertakes to make said repairs without permit, it is ordered to cease, and its officers and agents are threatened with arrest.

"Plaintiff further says that the said Commissioner of Public Buildings has ordered plaintiff to tear down and remove many of its billboards and signs, claiming that the same are unsafe and dangerous, and although plaintiff has offered and has always been willing and ready to repair said signs and billboards and put them and keep them in a safe and secure condition, yet defendants have refused to permit the plaintiff so to do, and as rapidly as said boards become insecure and dangerous, are ordering them taken down and removed. In this way defendants seem determined to ultimately condemn and cause to be removed plaintiff's entire plant, and to subject plaintiff to all the loss and damages hereinbefore mentioned.

"Plaintiff further represents that since the adoption of the last mentioned ordinances, the city of St. Louis, by and through the Commissioner of Public Buildings and the police officers, has prevented the plaintiff from extending its business, and has harassed plaintiff in the conduct of its business, and prevented it from maintaining and repairing the signs and billboards theretofore erected, and still continues to do so; and although plaintiff has contended that such ordinances are void, for the reasons above mentioned, and that no permit is or was necessary to allow plain-

tiff to repair and maintain its existing boards and to erect new ones on private property, yet the defendants have denied plaintiff these privileges.

"Plaintiff further states that said Commissioner of Public Buildings has served upon plaintiff notice that a number of its boards are in an unsafe and dangerous condition, and has ordered the same torn down and removed, but has refused, and still refuses, to permit plaintiff to repair and strengthen said boards; that by reason of these facts, plaintiff is in constant danger of being subjected to liability for any damages that said unsafe boards may cause, and that unless the defendants be restrained and enjoined from interfering with the plaintiff in repairing and strengthening and rebuilding said boards, plaintiff may at any time suffer great damage and loss, and innocent parties may be greatly injured and caused to suffer; that although said boards were originally built in a safe and secure manner, yet the effect of the elements and of time has necessitated said repairs, and the same should be made at once and without further delay; that plaintiff, by the action of said Commissioner of Public Buildings, as hereinbefore set out, and of the police officers of the city of St. Louis, has been prevented from continuing in business, and is now being prevented not only from prosecuting its business in a lawful and reasonable way, but has and is preventing the plaintiff from putting its boards in a safe and suitable condition, and thus relieving itself from liability, and innocent parties from danger; that the results of this interference on the part of defendants with plaintiff's lawful business will be irreparable loss to the plaintiff and possibly personal injury to innocent parties passing close to boards which are in need of repair.

"Plaintiff further represents that it is informed and believes that Rolla Wells, as Mayor of the city of St. Louis, has directed the Commissioner of Public

Buildings to stop the plaintiff from building additional signs and billboards, or repairing old signs or billboards within the city of St. Louis, unless the same shall be constructed strictly in accordance with the unreasonable and unnecessary provisions of the ordinances above mentioned; that the said Commissioner of Public Buildings and police officers of the city of St. Louis are determined to enforce said unreasonable and unnecessary provisions of said ordinances, to the great injury, loss and detriment of plaintiff; that unless the defendants, and each of them, are restrained by the injunction of this Honorable Court, the business of plaintiff will be irretrievably ruined, its property torn down and destroyed, without due process of law, its officers, agents and workmen subjected to the disgrace, annoyance and expense of being arrested, and unless said defendants be enjoined by this Honorable Court from interfering with the plaintiff in repairing and maintaining its existing boards, said boards will naturally, in the course of time, become dangerous and unsafe, and plaintiff will be rendered liable to suits for damages for injuries to innocent parties; that plaintiff will be unable to comply with and perform the several contracts entered into with its customers prior to the passage of said ordinances, which said damage cannot be estimated; that plaintiff has not and cannot have any adequate remedy of law under the circumstances and facts hereinbefore set forth; that plaintiff further represents that the damage and injury to plaintiff is not only irreparable, but so imminent as to require immediate protection from this court of equity.

"Wherefore, plaintiff prays that, upon a hearing herein, each of the ordinances above set forth and each section thereof be declared null, void, unconstitutional and of no effect, and that a writ of injunction issue from this court perpetually enjoining and restraining the said city of St. Louis and its co-defend-

ants, the officers of said city, and all other officers and agents and employees of said city, from tearing down any of the signs or billboards belonging to or controlled by plaintiff, and from interfering in any manner whatever with plaintiff, its agents or workmen, in repairing its existing signs and billboards, or in erecting any new signs or billboards within the said city of St. Louis, and for such other and further relief as to the court may seem meet and just.

"And plaintiff further prays the court that in view of the imminent danger to plaintiff's rights and to innocent parties, a writ of injunction be issued from this court, temporarily enjoining and restraining the defendants, their officers, policemen, agents and servants until the further order of this court from tearing down any of the signs or billboards owned or controlled by plaintiff, anl from interfering in any way with plaintiff's officers, agents and workmen in the prosecution of plaintiff's business, in the repairing and maintaining of its signs and billboards, or in the erection of new signs and billboards within the city of St. Louis, and for such other temporary relief as to the court may seem meet and just."

### ANSWER.

"Come now the above named defendants, and for their answer to the bill of complaint heretofore filed in this cause, respectfully show to the court:

"Defendants admit that the plaintiff is a corporation duly organized and existing under the laws of the State of Missouri; that the defendant the city of St. Louis is a municipal corporation organized and existing under and by virtue of its charter and the laws of the State of Missouri; that the defendant Rolla Wells is Mayor of the city of St. Louis, duly elected, qualified and acting; that the defendant James A. Smith is the Commissioner of Public Buildings of the

city of St. Louis, duly appointed, commissioned, qualified and acting; that the defendant Christopher G. Gillaspy is the duly appointed, commissioned and qualified Assistant Chief of Police and is the Acting Chief of Police within and for the said city.

"Defendants further admit that the plaintiff is engaged in the business of sign painting, billposting and general advertising; that it has erected and now maintains a large number of billboards and signs upon vacant property and upon buildings situated in all parts of the city of St. Louis; that with respect to the number or total area of the billboards and signs owned, leased, used or maintained by the plaintiff, within the limits of the city of St. Louis, the defendants have no sufficient knowledge or information upon which to base a belief, and therefore deny that the said plaintiff owns, leases or uses as great a number of signs and billboards within the limits of said city or of such area as is alleged by the plaintiff.

"Defendants deny that all of the billboards and signs built, constructed, leased or maintained by the plaintiff are built and constructed in a safe, substantial and workmanlike manner so that the same do not menace or endanger in any way whatsover the safety of any persons whose business may require them to pass by or in close proximity to any of said boards; but the defendants allege the fact to be that some of the said boards and signs are so built and constructed as to be and constitute a standing menace to the health and safety of persons whose business requires them to pass by or in close proximity to said boards, and to be a menace and a danger to the safety and security of property in their vicinity.

"Defendants admit that none of the said signs or billboards are constructed upon any public street, and that the same are constructed upon lots adjoining the public streets and alleys of the said city, defendants further aver that they have no knowledge or

information upon which to base a belief as to whether any of the advertisements or other matter placed and maintained by the plaintiff upon its signboards are injurious or helpful to the morals of persons seeing or reading the same, but that the ordinance provisions set out in plaintiff's petition respecting the construction of signboards are not aimed at, nor do the said ordinance provisions bear upon or control in any way, the character of advertisements placed or painted upon bill and signboards, but relate solely to the construction of the signboard itself and to its locality with respect to the streets and buildings of the said city.

"Defendants further say that they have not sufficient knowledge or information upon which to form a belief as to the allegations in plaintiff's petition respecting the plaintiff's contracts with the owners of lots and buildings and other persons relating to bill and signboards, or relating to advertising matter to be placed upon said billboards by the plaintiff and therefore deny said allegations.

"Defendants admit the enactment by the city of St. Louis of the ordinances set forth in plaintiff's petition, and admit that the said ordinances are now in force in said city, having been duly passed and enacted by the Mayor and Municipal Assembly of the said city being authorized by the charter of said city and by the laws of the State of Missouri; and defendants deny that said ordinances are void or illegal in any of the respects set forth as reasons for the invalidity of said ordinances in plaintiff's petition numbered first to tenth inclusive.

"Defendants further admit that so far as their knowledge and information goes the billboards constructed and maintained by the plaintiff prior to the going into effect of the ordinance provisions complained of were constructed in accordance with licenses or permits issued by the city of St. Louis, through its duly authorized agents, but allege

that said permits were issued in pursuance of and in exact conformity with lawful ordinance provisions of the city of St. Louis in force and applicable thereto at the time of the issuance of the said permits; and defendants, not admitting but denying that the plaintiff has paid to the city of St. Louis in the way of fees for permits and licenses the sum of $5000 or any sum approximating said amount, allege that whatever payments were made by the plaintiff to the city of St. Louis for licenses or permits were voluntarially made by plaintiff in accordance with and in pursuance of and in conformity to valid ordinance provisions of the city of St. Louis which were in force at the time of making such payments.

"Defendants admit that some of the billboards constructed or maintained by the plaintiff are in need of repair and improvements; that some of them are old and becoming unsafe and dangerous; and that it is necessary, in order to protect the plaintiff from liability for damages, and to protect the citizens of the city of St. Louis in passing along the public streets from injury therefrom, that the said bill and signboards be strengthened and repaired; but defendants deny that the plaintiff has made repeated attempts, or any attempt whatsoever, to repair said boards in accordance with the ordinance provisions in force at the time of said attempted repairs, and deny that the Commissioner of Public Buildings has refused permits to or has prohibited plaintiff from making such repairs, and allege that in fact the Commissioner of Public Buildings, wherever it has come to his knowledge or has been represented to him that any of the plaintiff's billboards were dangerous or in an unsafe condition, has notified the plaintiff to make them safe in accordance with the ordinance provisions in force at the time, and set up fully in plaintiff's petition.

"Defendants admit that the said Commissioner of Public Buildings has indicated his intention to enforce

the ordinances of the city of St. Louis relating to the construction and maintenance of signboards and is enforcing and endeavoring to enforce those provisions of the said ordinances referred to, complained of and set forth in plaintiff's petition.

"Defendants deny that the said Commissioner of Public Bulidings has indicated any intention whatsoever to require plaintiff to tear down their sign and billboards erected in accordance with prior provisions of the city ordinances and to reconstruct them in accordance with the present provisions of said ordinances, and defendants allege that, if the plaintiff will be required within the next two years to pay to the city of St. Louis a sum aggregating $4000 for permits for the construction or reconstruction or repair of billboards, or any sum whatsoever, such requirements will arise from the plaintiff's voluntarily undertaking to procure permits for the construction or reconstruction or repair of its old boards to such an extent that under the ordinances complained of the sums payable for such permits will aggregate said sum of money; that none of the defendants have made any requirements as to the rebuilding or reconstruction or repairing of the said boards except such requirements as are expressly demanded by the provisions of the ordinances set forth and complained of in plaintiff's petition.

"Defendants further say that whether or not plaintiff has made such contracts with its customers and owners of property and buildings as that if it carries them out it will necessitate the violation by the plaintiff of the city ordinances respecting billboards, they have not sufficient knowledge or information upon which to form a belief, and therefore deny plaintiff's allegations relating thereto.

"Defendants deny that in repairing or rebuilding, in accordance with the provisions of said ordinances, the total number of square feet of space now used by

235 Sup.—9

plaintiff, would be reduced to any such extent as is alleged by plaintiff, or to any extent whatsoever.

"Defendants further deny that any of plaintiff's contracts would be forfeited or cancelled, or that plaintiff would be subjected to any damages whatsoever for the non-fulfillment of said contracts, and defendants further deny that plaintiff would be required to pay the same ground rentals to property-owners that it has heretofore paid, and deny that it is impossible for plaintiff to comply with the said ordinances and continue in business, and deny that if said ordinances are upheld and enforced plaintiff will be prevented from increasing its business in the city of St. Louis and will be deprived of any business or property that it now has without compensation.

"Defendants further say that since the passage and going into effect of the ordinance provisions set out in plaintiff's petition and complained of therein, plaintiff has been at full liberty at all times to build new signs and billboards and to repair and improve its old ones, but that the defendants have insisted that since the passage and going into effect of the said ordinance provisions the plaintiff should comply with the provisions of the said ordinances in the building of new sign and billboards and in repairing and improving its old ones; and defendants further deny that they are in any way threatening or harassing plaintiff or are depriving plaintiff of any lawful use of plaintiff's property.

"Defendants further say that plaintiff, since the adoption of the said ordinance provisions, has several times made application to the Commissioner of Public Buildings for permits to erect new bill and signboards, and in said applications has always refused to agree to comply with the regulations and requirements of the ordinance provisions then in force; that the said Commissioner of Public Buildings has constantly and persistently refused to issue permits to plaintiff to

erect any bill or signboards since the going into effect of the said ordinance provisions unless the plaintiff should agree to construct the same in accordance with the provisions of said ordinances, and the said Commissioner of Public Buildings has demanded from plaintiff the payment of the precise amount of fees provided for in said ordinances and no more, and the plaintiff has refused to recognize or pay the fees provided for by the provisions of the said ordinances.

"Defendants further admit that on or about the 4th day of May, 1906, the plaintiff presented to the Commissioner of Public Buildings a number of applications for permits to erect new sign and billboards and to repair and rebuild old ones within the city of St. Louis, but they deny that the said plaintiff in said application or otherwise agreed to build, repair or reconstruct any of said sign or billboards in accordance with reasonable and proper regulations; and defendants further admit that the said Commissioner of Public Buildings refused to issue permits on any of said applications for the reason that none of the applications conformed to, but were all in direct violation of, the ordinances then applying to the erection of bill and signboards.

"Defendants further admit that the said commissioner wrote to Messrs. Bishop and Cobbs, plaintiff's attorneys, the letter set forth on page nine of plaintiff's petition.

"Defendants further admit all the allegations in plaintiff's petition respecting an application for a permit to build a frame billboard at No. 2222-2236 North Broadway on the lot formerly occupied by what was known as the Round Top Market, except that defendants deny that in said application plaintiff sought a permit to construct and maintain a billboard in a safe, secure or reasonable manner.

"Defendants further admit the allegations of plaintiff's petition respecting plaintiff's application

for a permit to repair a billboard heretofore built at Nos. 1313 to 1329 Washington Avenue, except that the defendants deny that the plaintiff made application to repair said billboard in accordance with the ordinance provisions set forth in plaintiff's petition and then in force, or that plaintiff proposed or agreed in said application, or otherwise, to repair the said board in a safe, secure or reasonable manner.

"Defendants further admit that the Commissioner of Public Buildings, in endeavoring to enforce the provisions of said ordinances of the said city of St. Louis, has served notice on plaintiff to repair such of its billboards and signs as are unsafe and in need of repair; and that in some instances plaintiff's applications for a permit to repair billboards have been refused, but that refusal was for the reason that the application for the permit did not comply with the ordinances of the city of St. Louis then in force, and because the method of repair for which a permit was asked would not be in accordance with the said ordinances.

"Defendants further say that it is not true that the plaintiff has always, or has ever been at any time, ready and willing to repair its sign and billboards and to keep them in a safe and secure condition, but aver the fact to be that the plaintiff has at all times arbitrarily sought to override and disregard the ordinance provisions of the city of St. Louis respecting sign and billboards, and has contumaciously claimed a right to determine for itself under what regulations it will proceed to conduct its occupation, and what method of constructing, reconstructing or repairing its sign and billboards within said city is safe, proper or secure.

"Defendants deny that they are in any way animated by any purpose or determination to condemn and remove plaintiff's entire plant, or any part thereof, or to subject plaintiff to any loss or damage what-

soever, and defendants further aver that they neither entertain any such determination or purpose, or intention, nor have they ever expressed or intimated any such purpose, intention or determination, nor have they ever done, either singly or collectively, a single act tending in any way to show such purpose, intention or determination, nor tending in any way to do any injury or hurt to the plaintiff or to the plaintiff's business other than such unavoidable and incidental injury as may result to the plaintiff and other persons engaged in its business, or similar business, from the enforcement of the ordinance provisions passed for the protection of the people of the city of St. Louis.

''Defendants deny that Rolla Wells, as Mayor of the city of St. Louis, has given any directions whatsoever to the Commissioner of Public Buildings regarding the actions or business of this plaintiff, and aver that under the terms of the ordinance provisions the Commissioner of Public Buildings is the official charged with the enforcement of the ordinances of the city of St. Louis relating to his office, and with the enforcement of the ordinances relating to plaintiff's business and here complained of, and that that official is now and during all the time that he has held said office done nothing more than endeavored to enforce all the provisions of said ordinances.

''Defendants further deny each and every other allegation and statement in plaintiff's petition contained, save and except those hereinabove expressly admitted.

''Defendants further state that the ordinances set forth in plaintiff's petition were duly enacted by the city of St. Louis, under and by virtue of the provisions of the charter of said city, and particularly with the following provisions of said charter, namely, paragraph 5 of section 26 of article III, paragraph 6 of section 26 of article II, and paragraph 14 of section 26 of article III.

"Defendants further aver that the said ordinances are valid, for many reasons, and among others, for the following reasons in particular:

"That with the ordinary methods employed in construction of billboards and signboards, in this and other cities, owing to the softening of the soil by reason of rain and snow, there is always danger, during periods of high wind, that these boards will fall; that they are almost universally supported by wooden posts sunk into the ground, and sometimes braced from behind, but never in front, where they face the street or sidewalk; that in the natural course of events these posts and braces are apt to decay underneath the level of the ground, where inspection is difficult, if not impossible; that with the increasing height or area of the board the danger of falling becomes greater by reason of the raising of the center of gravity, and by reason of the greater resistance offered to the wind; that openings or spaces underneath tend to decrease this danger; and that this is also true of lateral openings or spaces that break the continuity of such boards or signs.

"And defendants further aver that there is bound to be a limit imposed on the height of these boards and that the city has just the same right to limit the height of billboards as it has to limit the height of buildings; and that there is, in the nature of things, bound to be a limit beyond which the boards would be unsafe, unsubstantial and dangerous to the life, the health and the comfort of the citizens, and that the city has a right, in the first instance, to determine what this limit shall be; that it is commercially impossible, by reason of prohibitive expense and smallness of return, to erect such boards of the same material, in the same manner, or with the same safety as houses, and the rules relative to houses should not be applied to the regulations regarding such boards.

"And the defendants further aver that on many occasions assaults, robberies and larcenies have occurred under the shelter of billboards located along the edge of or close to the sidewalks and streets of said city; that in many of these instances the offenders concealed themselves behind the billboards and suddenly stepped out upon their unsuspecting victims; that in many instances such offenders have enticed their victims upon some pretext behind the billboards; that it has frequently happened that billboards so located have been used as a shield to persons engaging in illicit and improper cohabitation, and they have frequently been used as a privy or resort of necessity by persons answering calls of nature, thereby creating unbearable stench and nuisance for persons passing along the street or sidewalk.

"And defendants further aver that by reason of the security from detection furnished by billboards, the space or lot behind the said boards has been used on very many occasions for the deposit and accumulation of refuse, rubbish and filth; and the said boards have sheltered and promoted the maintenance and growth of underbrush and weeds.

"And your respondents say that the provisions of the ordinances attacked herein tend greatly to limit and do away with the dangers and nuisances complained of as having been heretofore fostered or promoted by bill and signboards; and your respondents respectfully submit that these ordinances should not, in any or all of their provisions, be wiped, by the decree of this court, from the laws of the city, and these complainants left to erect numerous sign and billboards, in violation of all provisions of the ordinances; throughout the city, unfettered and uncontrolled, except by consideration of their own profit.

"Wherefore, having fully answered, respondents pray that the injunction sought to be denied; and that

your respondents be suffered to go hence without day."

The affidavits introduced in evidence by plaintiff are as follows (formal parts omitted):

"John J. Reardon, being duly sworn, on oath says that he is and for the past ten years has been acquainted with the billboard located at west side of Fourth street, south of Elm street, in the city of St. Louis; that said board is about forty feet long and twenty-five feet high; that to his knowledge said board has been standing for the past ten years, and is still in a safe and secure condition; that said board and other billboards within the city of St. Louis, with which this affiant is acquainted, are well braced, and that there is no apparent danger of said boards falling or being blown down by any ordinary storm; that neither said board, nor any other billboard with which this affiant is acquainted in the city of St. Louis, is used to protect thieves, highwaymen, or persons committing nuisances, or for the protection of debris or weeds, to any greater extent than other structures and buildings located in the same neighborhood."

"Walter J. Garvey, being duly sworn, on oath says that he is and for the past seven years has been acquainted with the billboard located at northeast corner Twenty-first and Washington in the city of St. Louis; that said board is about 160 feet long and twenty-five feet high; that to his knowledge said board has been standing for the past seven years, and is still in a safe and secure condition; that said board and other billboards within the city of St. Louis with which this affiant is acquainted, are well braced, and that there is no apparent danger of said boards falling or being blown down by any ordinary storm; that neither said board nor any other billboard with which

this affiant is acquainted in the city of St. Louis, is used to protect thieves, highwaymen, or persons committing nuisances, or for the protection of debris or weeds, to any greater extent than other structures and buildings located in the same neighborhood.''

''William H. Hauschulte, being duly sworn, on oath says that he is and for the past seven or eight years has been acquainted with the billboard located at east side of Broadway, south of Grand avenue, in the city of St. Louis; that said board is about fifty feet long and fourteen feet high; that to his knowledge said board has been standing for the past seven or eight years, and is still in a safe and secure condition; that said board and other billboards within the city of St. Louis with which this affiant is acquainted, are well braced, and that there is no apparent danger of said boards falling or being blown down by any ordinary storm; that neither said board, nor any other billboard with which this affiant is acquainted in the city of St. Louis, is used to protect thieves, highwaymen or persons committing nuisances, or for the protection of debris and weeds, to any greater extent than other structures and buildings located in the same neighborhood.''

''P. J. McAliney, being duly sworn, on oath says, that he is vice-president and general manager of the St. Louis Gunning Advertising Company; that he has been connected with and acquainted with the business, the billboards, and the signs of this company for the past thirteen years, and has been general manager of the company for the past four years; that he is acquainted with every board and sign built by the company in the city of St. Louis; that he knows the condition and surroundings of every board and sign; that, as general manager, he frequently visits the various billboards and signs, and keeps himself informed as to their condition and surroundings; that so far as he knows and has been able to learn, the billboards and

signs constructed by plaintiff have not been used for the protection of thieves and highwaymen, as much as have other structures, buildings and doorways which are situated in the same neighborhood; that said billboards and signs are not used for the protection of persons committing nuisances behind or beside them, to any greater extent than are the other structures, buildings and alleyways located in the same vicinity; that weeds and debris are not allowed to collect and do not collect and accumulate behind or around said billboards to any greater extent than on the vacant lots, back yards, and barn yards located in the same neighborhood with said billboards, and that none of said billboards are in themselves nuisances, nor are they used to protect or encourage the committing of nuisances to any greater extent than any other structure or building within the same neighborhood where such billboards are located.

"Affiant further says that said billboards are constructed in a safe and suitable way; that they are thoroughly braced and anchored to posts set from four to five feet in ground, and that many of the boards now maintained or controlled by plaintiff were built from ten to twenty years ago, and are still standing and safe; that the elements cause the material used in the construction of said boards to decay, and that occasional repair of said boards is necessary; that unless the material with which said boards are constructed has decayed, said boards are still in a safe condition; that although some of said boards are twenty-four feet high, and have stood for ten or fifteen years, they are still sound and safe; that if plaintiff were allowed to properly repair said boards and replace the decayed parts, there could be no danger whatever of said boards falling or being blown down; that during affiant's acquaintance for the past thirteen years with the boards constructed by plaintiff, almost none of said boards have ever blown or fallen down; that even dur-

ing the great tornado of 1896, many of the boards which are now standing, stood the test of that storm and were not blown down, although in the same neighborhood where said boards were located many of the buildings and other structures were down to the ground; that if said boards are properly constructed, as plaintiff constructs them, there is absolutely no danger of their falling or being blown down, although they should be twenty-four or thirty feet high, or even higher; that the only danger comes from the decay of the material used in their construction, and that this danger can be easily remedied by permitting the plaintiff to make the ordinary and needful repairs.''

"S. J. McKinley, being duly sworn, on oath says, that he is superintendent of construction for the St. Louis Gunning Advertising Company, and has had control of the building, repairing and maintaining of the billboards and signs of that company for the past five years; that he makes frequent visits to all parts of the city, inspects all the boards constructed and maintained by plaintiff, and knows their condition and surroundings; that he has read the foregoing affidavit made by P. J. McAliney and concurs in all the statements therein made; that he has personal knowledge and experience in connection with the building of the billboards in the city of St. Louis, which are owned or controlled by the plaintiff, and knows that said billboards are not used for the protection of thieves or robbers to any greater extent than any other structures in the same neighborhood; that they are not used to protect nuisances, or persons committing nuisances to any greater extent than other structures in the same neighborhood; that they are not and do not encourage nuisances, and that no regulation of the height of said billboards is necessary for the protection of life or limb of persons passing in close proximity to them; that billboards can be constructed and are constructed in as safe and secure a manner as any other structure

or building; that many of the billboards owned and controlled by plaintiff have withstood the storms for years, and that so far as this affiant knows, none of them has ever blown down or caused any damage or injury to any person; that some of them, by reason of their age and the influence of the elements, have decayed and are in need of repair, but by proper repairing and maintenance, said boards can be kept as secure and safe as any other structures which are built in the city of St. Louis.''

And thereupon the defendants, by their counsel, read and submitted to the court the following affidavits (formal parts omitted):

''Cornelius Molony, being duly sworn deposeth and saith: My name is Cornelius Molony; I reside at 4452 Greer avenue, in the city of St. Louis, Missouri; I am at the present time an officer in the department of health of the city of St. Louis; I have been connected with this department in an official capacity for fourteen years. During that period the health department has had numerous complaints with reference to lots behind billboards standing and erected at or near the inside edge of sidewalks in this city. These complaints have been to the effect that the lot immediately behind these billboards has been used as a water-closet by vagrants or by persons passing by, and by reason of the protection of the billboard has been used for the deposit and accumulation of refuse, rubbish and filth. In addition thereto it has always been a matter of great difficulty to get the weeds trimmed down behind these billboards, and in almost all instances where such boards were erected at the front of lots it has been necessary to proceed in court against the parties responsible for the condition of such lots, in order to get the weeds cut down and removed.''

''William E. Reames, being duly sworn, deposeth and saith: My name is William E. Reames. I reside at 4114 North Newstead Avenue, in the city of St.

Louis, Missouri. I am at the present time an officer in the department of health of the city of St. Louis; I have been connected with this department in an official capacity for three years. During that period the health department has had numerous complaints with reference to lots behind billboards standing and erected at or near the inside edge of sidewalks in this city. These complaints have been to the effect that the lot immediately behind these billboards has been used as a water-closet by vagrants or by persons passing by, and by reason of the protection of the billboards has been used for the deposit and accumulation of refuse, rubbish and filth. In addition thereto, it has always been a matter of great difficulty to get the weeds trimmed down behind these billboards, and in almost all instances where such boards were erected at the front of lots it has been necessary to proceed in court against the parties responsible for the condition of such lots, in order to get the weeds cut down and removed.''

''James Johnson, being duly sworn, deposeth and saith: That he is at the present time an officer in the Metropolitan Police Force of the city of St. Louis, holding the rank and grade of captain, commanding the Fourth Police District in said city; that he has been a member of the police department for a period of twenty-six years; that during the past ten years a number of robberies and larcenies have occurred within the city, in which the thief or robber has stepped out from or escaped behind the shelter of billboards, standing at or near the inside edge of the sidewalk; that the space behind such billboards is frequently used for the purpose of a water-closet by various persons, creating a great stench and nuisance to persons passing along the sidewalk.''

''James A. Smith, being duly sworn, deposeth and saith: That he is the Commissioner of Public Buildings of the city of St. Louis; that he is familiar with

the methods of construction usually and customarily employed in building and constructing bill and sign-boards in the city of St. Louis or in other cities of the country; that he is a practical architect and builder and is familiar with the construction of buildings and structures of all sorts. That with the ordinary methods employed in the construction of bill and signboards in this and other cities, owing to the softening of the soil by reason of rain and snow, there is always danger, during periods of high wind, that these boards will fall; that they are almost universally supported by posts sunk into the ground, and sometimes braced from behind, but never in front where they face the street or sidewalk; that with the increasing area the danger of falling becomes greater by reason of greater resistance offered; that openings or spaces underneath tend to decrease this danger. And this is also true of lateral openings or spaces that break the continuity of such signs or boards; that it would be impossible practically to build them beyond a certain height so as to be safe and substantial, for the reason that to construct them to such a height substantially and safely would entail a prohibitive expense from the commercial standpoint, in their construction.''

"Clyde Klechner, being duly sworn, deposeth and saith: My name is L. Clyde Klechner; I reside at 3418 Laclede Avenue in the city of St. Louis, Missouri; I am at the present time an officer in the department of health of the city of St. Louis; I have been connected with this department in an official capacity for three years. During that period the health department has had numerous complaints with reference to lots behind billboards standing and erected at or near the inside edge of sidewalks in this city. These complaints have been to the effect that the lot immediately behind these billboards has been used as a water-closet by vagrants or by persons passing by, and by reason of the protection of the billboards has been used for the

deposit and accumulation of refuse, rubbish and filth. In addition thereto it has always been a matter of great difficulty to get the weeds trimmed down behind these billboards, and in almost all instances where such boards were erected at the front of lots it has been necessary to proceed in court against the parties responsible for the condition of such lots, in order to get the weeds cut down and removed.''

''Peter Reynolds, being duly sworn, makes oath and says that he is and for 33 years past has been an officer in the Metropolitan Police Force of the city of St. Louis, holding the rank and grade of captain, Central Police District of said city; and at various times and places within the last five years a number of robberies and holdups have occurred behind billboards located along the edge or close to the sidewalks and streets of said city, in such cases the offenders concealing themselves behind billboards and stepping out upon their victims or enticing their victims behind billboards; and it has also frequently happened that the said billboards so located have been used as a shield to persons engaging in illicit and improper cohabitation, and have further been used as a privy or resort of necessity for persons answering calls of nature.''

The court found the issues for the plaintiff and decreed accordingly, holding all of said sections of said ordinance 22,022, in so far as they related to signs and billboards, to be invalid, null and void, and permanently enjoined defendants, and each of them, from enforcing each and all of them.

In due time and in proper manner, defendants appealed the cause to this court.

## OPINION.

I. In order to properly understand this case and to make an intelligent disposition of the same, a general statement of the character of plaintiff's business,

the purposes designed to be accomplished thereby and the means by which its ends are attained should be made.

Speaking generally, plaintiff's business consists of out-door advertising, displayed at conspicuous points and places by means of pictures, signs and letters. The more conspicuous and public the place the greater is the desire to cover it with that class of advertisements. The privacy of the home, places of public resort, retreats for rest and recreation, seats of learning and even the sanctity of the church are as much within the shadow of the structures hereinafter described as are the vacant lots and commanding views along the public thoroughfares of the city. The walls and roofs of many residences and business houses are not exempt from this intrusion. While all kinds of business and merchandise are advertised by this means of display, yet observation and common experience teach us that probably the greater per cent thereof proclaim the newest and choicest brands of liquors, tobacco, cigars and cigarettes, and announcements of various plays which are to be presented at the various theaters. These, however, are interspersed with information regarding the comforts and necessities of life.

These billboards are temporary affairs, consisting of upright timbers, or posts, set in the ground at various distances from each other, braced from the rear, with stringers running from one to the other and there secured by means of nails or bolts. These stringers are then covered with boards standing on ends and nailed thereto, and thereby presenting a smooth vertical surface upon which the various announcements are made or displayed.

To this general statement, we might also add that there is but one virtue connected with this entire business, and that is the advertising itself. This is a legitimate and honorable business, if honorably and legitimately conducted, but every other feature and inci-

dent thereto have evil tendencies, and should for that reason be strictly regulated and controlled. [ The sign-boards upon which this class of advertisements are displayed are constant menaces to the public safety and welfare of the city; they endanger the public health, promote immorality, constitute hiding places and retreats for criminals and all classes of miscreants. They are also inartistic and unsightly.

In cases of fire they often cause their spread and constitute barriers against their extinction; and in cases of high wind, their temporary character, frail structure and broad surface, render them liable to be blown down and to fall upon and injure those who may happen to be in their vicinity. The evidence shows and common observation teaches us that the ground in the rear thereof is being constantly used as privies and the dumping ground for all kinds of waste and deleterious matters, and thereby creating public nuisances and jeopardizing public health; the evidence also shows that behind these obstructions the lowest form of prostitution and other acts of immorality are frequently carried on, almost under public gaze; they offer shelter and concealment for the criminal while lying in wait for his victim; and last, but not least, they obstruct the light, sunshine and air, which are so conducive to health and comfort. |

House signs and sky signs are similar to billboards and are used for the same purposes, except they are attached to the walls of buildings or are constructed upon the roofs thereof. They endanger the public safety only in being liable to be blown down and injure people in their fall. They also assist in the spread of fire and greatly interfere with their extinction.

The amount of good contained in this class of this business is so small in comparison to the great and numerous evils incident thereto that it has caused me to wonder why some of the courts of the country have seen fit to go as far as they have in holding statutes

235 Sup.—10.

and ordinances of this class void, which were only designed for the suppression of the evils incident thereto and not to the suppression of the business itself. While advertising, as before stated, is a legitimate and honorable business, yet the evils incident to this class of advertising are more numerous and base in character than are those incident to numerous other businesses which are considered *mala in se;* and which for that reason may not only be regulated and controlled, but which may be entirely suppressed for the public good under the police power of the State. My individual opinion is that this class of advertising as now conducted is not only subject to control and regulation by the police power of the State, but that it might be entirely suppressed by statute, and that, too, without offending against either the State or Federal Constitution.

Under the light of these general observations, we will now take up and consider the various objections urged against the validity of the sections of the ordinance mentioned herein. Because of their similarity and kindred nature, what is said of one will apply equally as well to the other; and for that reason we will consider sections 81 and 177 together, the former relating to signs and the latter to billboards.

The first insistence of counsel for plaintiff is, that even though it be conceded that the State of Missouri possessed the power to control and regulate signs and billboards in the manner provided for by the ordinances in question, still they insist that the State granted no such power to the city of St. Louis, and for that reason the city had no authority to pass said ordinances. This contention of plaintiff is denied by counsel for defendants, and they point to the following provisions of the city charter which they contend grants that power to the city, to-wit:

Paragraph 5 of section 26 of article 3, after a long enumeration of things and occupations to be licensed

etc., provides: "To license, tax and regulate all other business, trade, avocations or professions whatever"; and after enumerating many other things, it winds up with this clause: "To license, tax, regulate or suppress all occupations, professions and trades not heretofore enumerated of whatever name and character."

And paragraph 14 of section 26 of article 3, known as the general welfare clause, reads as follows: "Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufacturers, and to enforce the same by fines and penalties not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars."

Counsel for plaintiff rely upon the following authorities in support of their position: City of St. Louis v. Heitzeberg Packing Co., 141 Mo. 375; Yates v. Milwaukee, 10 Wall. 497; Crawford v. Topeka, 51 Kan. 762, and Bryan v. Chester, 212 Pa. St. 259. These cases simply hold that a city has no power by ordinance to declare that to be a nuisance which is not so in fact, or to suppress in part or *in toto* any business within its limits which is not a nuisance *per se*. But each of those cases recognize the fact and hold that the city possessed the power to enact ordinances for the reasonable regulation and control of the matters therein mentioned. It is, therefore, seen that none of said cases support the insistence of counsel for plaintiff.

Returning to the charter provisions before mentioned, it will be seen that the city is given the power to license, tax and regulate all businesses, trades, avocations or professions; and to license, tax, regulate or suppress all occupations, professions and trades, etc. It cannot be seriously contended that plaintiff is not

engaged in some sort of business, trade or occupation; and if so, then clearly under the foregoing charter pro· visions that business was subject to be licensed and taxed, and to be regulated and even suppressed, if in character it was a nuisance *per se.*

And under the general welfare clause, before copied, the city was given express and ample authority to pass any and all ordinances necessary to "maintain the peace, good government, health and welfare of the city," etc. It cannot be gainsaid that the ordinances in question are not necessary for the maintenance of the peace, safety, morality, health, good government and the general welfare of the city.

While it is true there is no express authority to be found in the charter authorizing the city to pass these particular ordinances by name, yet that is not necessary. All that is required in that regard is, that the ordinances in question must be embraced within and be authorized by the general provisions of the charter granting to the city the power to enact them.

The framers of the charter could no more foresee what particular ordinances would be necessary to pro tect the peace, safety, health and morality of the city than could the framers of the Constitution of the State foresee what statutes would be required to protect the safety, health and morality of the people of the State. In the very nature of things, in many, if not in most, instances, only a general power could be delegated to the city, ample in scope, however, to authorize the Mu nicipal Assembly to enact ordinances along those lines, as the exigency of the case might arise; otherwise there would be no necessity for the passage of any such ordinance, for the reason that the subject could be covered by a charter provision in the first instance. The very object of all general provisions, as well as the general welfare clause of the city charters, are for the purpose of enabling the law making power thereof to

enact ordinances to suppress all unforeseen evils as they might arise.

These observations are elementary and are in keeping with the rulings of this court in numerous cases where these provisions of the charter were presented for adjudication. Among the cases so holding are the following: City of St. Louis v. Galt, 179 Mo. 8; City of St. Louis v. McCann, 157 Mo. 301.

We, therefore, hold that the State delegated to the city of St. Louis the power and authority to enact the ordinances in question.

II. It is next contended by counsel for plaintiff that the various sections of said ordinance No. 22,022 are invalid, even though it be conceded that the charter gave the city authority to enact them, for the reason that said charter provisions themselves are unconstitutional, null and void in that (1) they authorize such restrictions upon the use of private property as to constitute a "taking" of property for public use without just compensation being paid therefor; (2) that they deprive plaintiff of its property without due process of law; and (3) that they discriminate against plaintiff and deny to it the equal protection of the law —all in violation of the State and Federal Constitutions.

We will consider these contentions in the order stated.

(1). Plaintiff takes the position, as to the first contention stated, that sections of said ordinance No. 22,022 are violative of sections 20, 21 and 30 of article 2 of the Constitution of Missouri, and of the 14th Amendment to the Constitution of the United States.

These constitutional provisions, in substance, provide, that private property shall not be taken or damaged for public use without just compensation first being paid therefor; and that no person shall be de-

prived of life, liberty or property without due process of law.

In the consideration of this proposition we may at the outset ignore the question of actually *taking private property for public use,* for the reason that there is no contention or pretense that any of plaintiff's property was either taken or damaged; the only contention in that regard being that said sections of the ordinance so limits the use of plaintiff's property that it *amounts to a taking* of it for public use within the meaning of both the State and Federal Constitutions. And in order to bear out that contention, we are cited to the following language contained in section 177 of this ordinance:

"No billboard hereafter erected, altered, refaced or reconstructed shall exceed fourteen feet in height above the ground, and every such billboard shall have an open space of at least four feet between the lower edge and the ground, which space shall not be closed in any manner while the billboard stands; nor shall any such billboard approach nearer than six feet to any building, nor to the side line of any lot, nor nearer than two feet to any other billboard, nor shall any such billboard exceed five hundred square feet in area, nor approach the street line on any street, alley or right of way on which any lot fronts or abuts, nearer than fifteen feet, but in all cases where the building line of buildings within fifty feet of the proposed billboard is more than fifteen feet from the street line or boundary line then such billboard shall not approach nearer to such street line or lot boundary line than the distance that the building line of such building is from such street line or lot boundary line; and where buildings are hereafter built near or adjacent to billboards such billboards shall be so moved or cut off as to leave a space of not less than six feet between the building and such billboard, which shall in all other respects also comply with the terms of this section."

It will be observed that this language prohibits plaintiff from erecting and maintaining any billboard nearer than six feet to the side lines of any of its lots, and nearer than fifteen feet to the front lines thereof, when they front or abut upon streets, and in certain instances, where the lots are narrow, the prohibition is complete, and thereby deprives plaintiff of the use of so much of its said lots. This ordinance also prevents the erection of any billboard exceeding fourteen feet in height above the surface of the ground, or where the base-board thereof is less than four feet therefrom, or where it approaches nearer than six feet to any building, or within two feet of any other billboard, or which contains more than five hundred square feet in area.

In support of this contention, counsel for plaintiff cite us to the following cases: St. Louis v. Hill, 116 Mo. 527; Mugler v. Kansas, 123 U. S. 661; Austin v. Murray, 16 Pick. 126; Gaines v. Buford, 1 Dana (Ky.) 481; Wright v. Hart, 182 N. Y. 330; People v. Green, 85 N. Y. App. Div. 400; City of Chicago v. Gunning, 214 Ill. 628; Commonwealth v. Boston Adv. Co., 188 Mass. 348; People v. Green, 85 N. Y. App. Div. 400, 83 N. Y. Supp. 460; Bostock v. Sams, 95 Md. 400; Bill Posting Sign Co. v. Atlantic City, 71 N. J. L. 72; Crawford v. Topeka, 51 Kan. 756; Passaic v. Paterson B. P. Co., 72 N. J. L. 285; State v. Whitlock, 149 N. C. 542; Western Co. v. Knickerbocker Co., 103 Cal. 111; Varney & Green v. Williams, 155 Cal. 318 (Mar. '09); Bryan v. Chester, 212 Pa. St. 259; People v. Murphy, 195 N. Y. 126 (Mar. 1909).

The case of St. Louis v. Hill, supra, was instituted to test the validity of an act of the Legislature passed in 1891 (Laws 1891, p. 47), known as the Boulevard Law, which provided that a city having a population of three hundred thousand inhabitants and more might establish a building line on a boulevard to which all structures thereon must conform. The act

contained no provision authorizing the city to condemn the land beyond the said building line, nor for notice to the property owner. This court held, first, that said act violated section 30 of article 2 of the State Constitution, which provides that no person shall be deprived of his property without due process of law; and, second, because it violated section 21 of the same article, which provides that private property shall not be taken for public use without just compensation. But that is not the case at bar. There the act virtually deprived the property owner of all his title and interest in and to the strip of ground beyond the building line mentioned, and apparently he could not use it for any purpose whatever. But there is no such provision here. The ordinance in question does not deprive plaintiff of any of its property, nor does it interfere with its use of the same, except it provides that it shall not erect any billboard thereon nearer than six feet to the side line, nor nearer than fifteen feet to the front line thereof. The billboards referred to have been fully described in a former paragraph of this opinion, and it is for that reason unnecessary to describe them again. The record shows that the reason why the Municipal Assembly enacted the ordinance prohibiting billboards from being erected nearer the street lines than that mentioned was for the purpose of protecting pedestrians and others upon the streets from injury in case said billboards should be blown down by high winds.

Common observation and experience teach us that generally when such structures are blown down the upright posts supporting them only partially break, near the ground, thereby permitting the entire structure to fall prone upon the ground, with the lower parts scarcely displaced from their natural position, while the top parts thereof reach out upon the ground the full number of feet that the boards are high. If they are fourteen feet in height, as the ordinance permits

them to be, then in falling they would fall upon and injure any one who should be passing along the street within fourteen feet of the base line of such billboards. From this it must be seen that the city wisely forbade the erection of such boards nearer than six feet to the side line of lots fronting upon the street, and nearer than fifteen feet to the front line thereof. The ordinance would have been wiser and better if it had prohibited all such structures from being erected nearer than fifteen feet to the line of any street, avenue or other public thoroughfare.

Not only this, but the record also shows that the ground in the rear of all such billboards is thereby practically converted into and is constantly being used as privies and general dumping grounds for all kinds of rubbish and filth. The grass and weeds which grow back of these billboards cannot be cut or destroyed on account of the posts and braces extending back from the rear thereof. And these billboards, like snowsheds, cause a suction behind them, and when the wind blows against their fronts it gathers up papers and all kinds of trash and combustible material and deposits them in the rear thereof, which are securely retained there by the growing grass and weeds until the fall of the year, when the frost and cold kills the grass and weeds, which in the course of a little time becomes dry and highly combustible. Under that condition we see hundreds, and perhaps thousands, of these billboards, with their solid walls and rear supports, extending from a few feet up to twenty-five or thirty in height, and possibly more, composed of boards and timbers dry as tinder, covered with paint and paper posters, and packed in behind with dry grass, weeds, paper and other combustible materials, which have been growing and accumulating for months, thereby creating hundreds of menacing conditions throughout the city, which may at any moment be ignited by a spark from a near-by chimney, a lighted match in the hands of some thought-

less child, or by a stump of a burning cigar, tossed aside by some careless hand. It will be readily seen that a fire thus started would grow and spread in no mean proportions; and in case of high wind, the results thereof might, in all probability, result very seriously in the destruction of property and disastrously to human life.

Even in the absence of evidence, common sense tells us that an opening of three or four feet between the ground and lower ends of such billboards, with openings in them at given distances, and spaces between each other and between them and near-by buildings, would greatly retard the spread of the fire and materially aid in checking its progress. It is also in keeping with common knowledge that the natural tendency of all such structures is to create and maintain just such nuisances as the record in this case shows these billboards have done in this case. Their ordinary and natural conditions and tendencies are nuisanous in character, if I may so coin that word.

In answer to these suggestions, counsel for plaintiff argues that the same nuisances might be committed behind fences and in buildings. While that is possible, yet it is not probable; nor does the erection and maintenance of a building or a fence along the lines of private property bordering upon public streets have the natural tendency to create any such nuisances as those mentioned. Buildings and fences are erected for the purpose of inclosing grounds and excluding therefrom strangers and trespassers; and common experience teaches us that they are effectual for that purpose, which is inconsistent with the idea that they promote and harbor nuisances, as billboards do, which rarely, if ever, inclose the grounds upon which they stand. That is not the purpose of their erection. Generally they are built along only one end or side of a lot or plot of ground, but occasionally upon two sides, and in rare instances upon three, but I have never seen or heard

of a lot being inclosed upon all four sides by billboards. The end of the lot fronting upon an alley is almost invariably left open, for the simple reason that the alley is not conspicuous in the public eye, and for that reason it would be useless to display advertisements at such places where they could not be seen.

The nearer the lot of ground is inclosed by such structures, provided there is a sufficient opening for ingress and egress, the greater will be the nuisances committed behind them, and the more dangerous they become to public health and safety.

If under the Constitution and laws of this State and Nation, the plaintiff is exempt from the operation of all statutes and ordinances of the character here under consideration, and may, in defiance of them, erect and maintain structures of this character, the inducing cause and natural abiding places for filth, disease and noxious odors, then the same constitutional provisions and laws would warrant plaintiff in erecting counterparts to its now existing billboards, only a few feet removed therefrom, close up the ends, cover the space thus inclosed, construct stools therein, and place a door or opening every few feet in the front or rear wall thereof. Plaintiff might also leave them unguarded as now and use the entire structures for advertising purposes, and public privies. The difference between the two classes of structures and nuisances which would follow would be one of degree and not of principle. The latter class of structures perhaps would induce a large number of persons to commit the abominable nuisances which are now being committed behind the former, yet they are no more objectionable in the one case than they would be in the other, barring, of course, the degree or extent thereof. The greater the degree or extent of the nuisance the greater are the offensive odors issuing therefrom, and the more likely are they to create sickness and disease. But neither should be tolerated for a moment. Decency and good morals no

less than the health and general welfare of the city imperatively demand their suppression; and if, as the evidence in the cause shows and as common knowledge and observation teach us, they cannot be abated in any other way than by regulating and controling the structures which invite and induce their commission, then the police power of the State is ample to warrant that control and regulation without infringing upon any constitutional rights of plaintiff.

This was the view taken by the Supreme Court of the United States in the case of Mugler v. Kansas, 123 U. S. 623. That case involved the constitutionality of the constitutional amendment of that State, prohibiting the manufacture and sale in that state of any and all intoxicating wines and liquors. The point was there made that it was not the manufacture and sale of the liquor which caused the evils the amendment was designed to cure, but that it was the excessive use thereof that caused the evils and harmful conditions that existed in that State, and for that reason it was in effect insisted that the business of manufacturing and selling intoxicating liquors was not a nuisance *per se.*

Predicated upon those contentions, plaintiff further insisted that its business could not be suppressed under the police power of the government, and for that reason said amendment was violative of the Constitution of the United States, in that it took his property for public use without just compensation. In the discussion of that proposition, Mr. Justice HARLAN, in a masterly opinion, in speaking for the court said:

"But by whom or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere, else society will be at the mercy of the few, who, regarding only their own ap-

petites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to .do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, Sinking Fund Cases, 99 U. S. 700, 718, the courts must obey the Constitution rather than the lawmaking department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting. to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion

of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution.

"Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage, *is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits*. There is no justification for holding that the State, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil. If, therefore, a state deems the absolute prohibition of the manufacture and sale, within her limits, of intoxicating liquors for other than medical, scientific and manufacting purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, overrule the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the Constitution to another department. And so, if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage,

would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the Constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the lawmaking power, upon reasonable grounds, declares to be prejudicial to the general welfare.

"This conclusion is unavoidable, unless the Fourteenth Amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in Barbier v. Connolly, 113 U. S. 27, 31, that the Fourteenth Amendment had no such effect. After observing, among other things, that that amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and

civil rights as to their acquisition and enjoyment of property, the court said: 'But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the powers of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.'

"Undoubtedly the State, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the Constitution of the United States, and may not violate rights secured or guaranteed by that instrument, or interfere with the execution of the powers confided to the general government. [Henderson v. Mayor of New York, 92 U. S. 259; Railroad Co. v. Husen, 95 U. S. 465; New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650; Walling v. Michigan, 116 U. S. 446; Yick Wo. v. Hopkins, 118 U. S. 356; Morgan's Steamship Co. v. Louisiana Board of Health, 118 U. S. 455.]

"Upon this ground—if we do not misapprehend the position of defendants—it is contended that, as the primary and principal use of beer is as a beverage; as their respective breweries were erected when it was lawful to engage in the manufacture of beer for every purpose; as such establishments will become of no value as property, or at least, will be materially diminished in value, if not employed in the manufacture of beer for every purpose; the prohibition upon their being so employed is, in effect, a taking of property for public use without compensation and depriving the citizen of his property without due process of law. In other words, although the State, in the exercise of her police powers, may lawfully prohibit the manufacture and sale, within her limits, of intoxi-

cating liquors to be used as a beverage, legislation having that object in view cannot be enforced against those who, at the time, happen to own property, the chief value of which consists in its fitness for such manufacturing purposes, unless compensation is first made for the diminution in the value of their property, resulting from such prohibitory enactments.

"This interpretation of the Fourteenth Amendment is inadmissible. It cannot be supposed that the States intended, by adopting that amendment, to impose restrains upon the exercise of their powers for the protection of the safety, health or morals of the community. In respect to contracts, the obligations of which are protected against hostile state legislation, this court in Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 751, said that the State could not, by any contract, limit the exercise of her power to the prejudice of the public health and the public morals. So, in Stone v. Mississippi, 101 U. S. 814, 816, where the Constitution was invoked against the repeal by the State of a charter, granted to a private corporation, to conduct a lottery, and for which that corporation paid to the State a valuable consideration in money, the court said: 'No Legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. . . . Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them.' Again, in New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 672: 'The constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of

the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations.'

"The principle, that no person shall be deprived of life, liberty, or property, without due process of law, was embodied, in substance, in the constitutions of nearly all, if not all, of the States at the time of the adoption of the Fourteenth Amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. [Beer Co. v. Massachusetts, 97 U. S. 25, 32; Commonwealth v. Alger, 7 Cush. 53.] An illustration of this doctrine is afforded by Patterson v. Kentucky, 97 U. S. 501. The question there was as to the validity of a statute of Kentucky, enacted in 1874, imposing a penalty upon any one selling or offering for sale oils and fluids, the product of coal, petroleum, or other bituminous substances, which would burn or ignite at a temperature below 130° Fahrenheit. Patterson having sold, within that commonwealth, a certain oil, for which letters-patent were issued in 1867, but which did not come up to the standard required by said statute, and having been indicted therefor, disputed the State's authority to prevent or obstruct the exercise of that right. This court upheld the legislation of Kentucky, upon the ground, that while the State could not impair the exclusive right of the patentee, or of his assignee, in the discovery described in the letters-patent, the tangible property, the fruit of the discovery, was not beyond control in the exercise of her police powers. It was said: 'By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community against the

injurious exercise by any citizen of his own rights.
State legislation, strictly and legitimately for police
purposes, does not, in the sense of the Constitution,
necessarily intrench upon any authority which has
been codified, expressly or by implication, to the na-
tional government. The Kentucky statute under ex-
amination manifestly belongs to that class of legis-
lation. It is, in the best sense, a mere police regula-
tion, deemed essential to the protection of the lives and
property of citizens,' p. 504. Referring to the nu-
merous decisions of this court guarding the power of
Congress to regulate commerce against encroach-
ment, under the guise of state regulations, established
for the purpose and with the effect of destroying or
impairing rights secured by the Constitution, it was
further said: 'It has, nevertheless, with marked dis-
tinctness and uniformity, recognized the necessity
growing out of the fundamental conditions of civil
society, of upholding State police regulations which
were enacted in good faith, and had appropriate and
direct connection with that protection to life, health,
and property which each State owes to her citizens.'
See, also, United States v. Dewitt, 9 Wall. 41; License
Tax Cases, 5 Wall. 462; Pervear v. Commonwealth, 5
Wall. 475.

"Another decision, very much in point upon this
branch of the case, is Fertilizing Co. v. Hyde Park,
97 U. S. 659, 667, also decided after the adoption of the
Fourteenth Amendment. The court there sustained
the validity of an ordinance of the village of Hyde
Park, in Cook county, Illinois, passed under legisla-
tive authority, forbidding any person from transport-
ing through that village offal or other offensive or
unwholesome matter, or from maintaining or carrying
on an offensive or unwholesome business or estab-
lishment within its limits. The Fertilizing Company
had, at large expense, and under authority expressly
conferred by its charter, located its works at a par-

ticular point in the county. Besides, the charter of the village, at that time, provided that it should not interfere with parties engaged in transporting animal matter from Chicago or from manufacturing it into a fertilizer or other chemical product. The enforcement of the ordinance in question operated to destroy the business of the company, and seriously to impair the value of its property. As, however, its business had become a nuisance to the community in which it was conducted, producing discomfort, and often sickness, among large masses of people, the court maintained the authority of the village, acting under legislative sanction, to protect the public health against such nuisance. It said: 'We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that every one shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions.' "

It is equally true of the ordinance in question, prescribing the location, height, openings between, their distance from other buildings, and the space be-tween the ground and the lower ends of all billboards. They are "fairly adapted to the end of protecting the community against the evils which confessedly result" from the present mode of construction, and to abate the intolerable nuisances which their maintenance naturally and reasonably invites and produces, and which are detrimental to the safety, morals and health of the city.

It is upon this same principle that the city licenses, taxes, regulates and controls saloons, slaughter houses, markets, soap factories, etc., and by which the

city is authorized to inspect buildings and prescribe rules and regulations for the control of fires, water, gas, electric wires and water closets installed therein.

The next case, Austin v. Murray, 16 Pick. 126, cited by counsel for plaintiff, no more supports their contention than do the two just considered. In that case the act authorized the city to establish a board of health, and empowered the selectmen of the city to appoint and locate the places where the dead should be buried, etc., and the fourth section provided, among other things, that no one should "bury any dead body so brought into the town, on any part of his own premises or elsewhere within the town." Murray was arrested for burying a dead body in a burying ground he owned at the time of and prior to the passage of the act. He assailed the constitutionality of the act for the reason that it deprived him of the use of his grounds without just compensation. In holding that act invalid, the court used this language: "The illegality of a by-law is the same, whether it may deprive an individual of the use of a part or of the whole of his property; no one can be so deprived, unless the public good requires it. And the law will not allow the right of property to be invaded, under the guise of a police regulation for the preservation of health, when it is manifest that such is not the object and purpose of the regulation. Now we think this is manifest from the case stated, in respect to the by-law in question. It is a clear and direct infringement of the right of property, without any compensating advantages, and not a police regulation, made in good faith, for the preservation of health. It interdicts, or in its operation necessarily intercepts, the sacred use to which the Catholic burying ground was appropriated and consecrated according to the forms of the Catholic religion, and such an interference, we are constrained to say, is wholly unauthorized and most unreasonable."

There the act clearly deprived the defendant of the use of his property, but in the case at bar, plaintiff is not even deprived of the use of its property. The ordinance in question only regulates the particular use mentioned, for the purpose of preserving the health, protecting the morals and keeping the peace of the city. There is nothing in the ordinance preventing plaintiff from using its premises for any and all purposes it may deem proper, even for billboards, in so far as that use is consistent with the public safety, health and morals. But whatever inconvenience and interference plaintiff may encounter in that use on account of these public matters, he must suffer without compensation.

The law governing such cases, and the reasons therefor, is well stated by this court in the case of Eichenlaub v. The City of St. Joseph, 113 Mo. l. c. 404. BLACK, P. J., in speaking for the court, used this language: "Many of the powers exercised by municipal corporations are police powers, delegated to the corporations for the public good; and it is well settled law that every citizen holds his property subject to the exercise of such powers. Such laws and regulations may and often do disturb the enjoyment of the property of the citizen, but such laws having that effect do not amount to the taking of private property for public use. They simply regulate the use. [1 Dillon on Municipal Corporations (3 Ed.), sec. 141.] 'All the property and vested rights of individuals are subject to such regulations of police as the Legislature may establish with a view to protect the community and its several members against such use or employment thereof as would be injurious to society or unjust toward other individuals.' [2 Story on the Constitution (5th Ed.), sec 1954. See, also Bluedorn v. Railroad, 108 Mo. 439.]"

And our able and distinguished associate, Judge Burgess, in speaking of this question for Division Two

of this court, in the case of St. Louis v. McCann, 157 Mo. 1. c. 308, said: ''This right, however, is not an absolute right, but is subordinate to the police power of the State. In speaking of this provision in the Constitution, in the case of State ex rel. v. Beattie, 16 Mo. App. 131, it is said: 'The Constitution of this State, in the Bill of Rights, provides that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry. . . . This, of course, does not confer upon any one the absolute right to use his property as he pleases. No such right exists in a state of civil society; but on the contrary, the right of one to use his own must always be exercised in subordination to the right of others. . . . The same instrument provides that 'no person shall be deprived of life, liberty or property, without due process of law.' Clearly, this provision was not intended to withdraw the rights of private property from the reasonable exercise of the police power by the legislative branch of the government. 'All rights are held subject to the police power of the State.' [Beer Co. v. Massachusetts, 97 U. S. 25.] The right of defendant to enjoy the gains of his own industry derived from conducting a real estate business in the city, was subordinate to the power of the city to require all persons thus engaged to pay license tax, and it makes no difference in principle that the tax was against the occupation, and not against property. It was no violation of the Constitution.''

In the case of the City of St. Louis v. Galt, 179 Mo. 8, generally known as the ''weeds'' case, which case involved the validity of an ordinance requiring property owners of the city to cut from their lots growing weeds, etc., MARSHALL, J., in speaking for the court, on pages 16 and 17, in his usual clear and forceful manner, stated the law upon this subject in the following lucid language:

"The second error assigned challenges the power of the city to enact the ordinance in question, and claims that it violates sections 4 and 20 of article 2 of the Constitution of Missouri, and the fifth and fourteenth amendments to the Constitution of the United States.

"These are grave defects in the ordinance, if the claim is well taken.

"The fourth section of article 2 (the Bill of Rights of our Constitution) is as follows:

" 'That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails of its chief design.'

"The point that this police regulation of the city violates this provision of our organic law, has, at least, the refreshing merit that it is a variation from the grounds upon which such city ordinances are usually attacked, but it is unfortunate for the defendant that this contention is not open to a more extended consideration than can be given to it in this case, because it has been firmly settled by the decisions in this State that the rights preserved to the individual by this section are held in subordination to the rights of society. [State v. Addington, 12 Mo. App. l. c. 217; s. c., 77 Mo. 110; St. Louis v. Meyrose Mfg. Co., 139 Mo. 560; State v. Beattie, 16 Mo. App. l. c. 145; City of Chillicothe v. Brown, 38 Mo. App. 609.]

"Therefore, the right of the defendant to grow weeds upon his city lot is subordinate to the right of society that he shall do so, because he would thereby endanger the health of others.

"Section 20 of article 2 of our Constitution prohibits the taking of private property for private use,

with or without compensation, without the consent of the owner, except for private ways of necessity, or for drains for agricultural or sanitary purposes. The defendant invokes this guaranty.

"The apparent infirmity underlying this contention is that the ordinance does not take or authorize any one to take the defendant's property, but only regulates his use of the property so as not to injure others. The same contention was held to be untenable in Green v. Savannah, 6 Ga. 1. c. 13, where a city ordinance forbidding the growing of rice within the limits of the city of Savannah, was held to be within the police power conferred upon the city by the State.

"The ordinance in question, therefore, does not violate the Constitution of Missouri.

"The fifth amendment to the Constitution of the United States, invoked by the defendant, prohibits the taking of private property for public use without just compensation, and provides that no person shall be deprived of life, liberty or property without due process of law.

"Enough has already been said to show that the defendant is not deprived of his property for public use, or at all, and therefore he is not without the protection of the Federal Constitution in this regard."

Neither is the case of Gaines v. Buford, supra, cited by counsel for plaintiff, an authority supporting their position in the case at bar.

In that case the Legislature of Kentucky, in 1824, passed an act to "repeal and amend the champerty and maintenance law, and more effectually to secure the bona-fide occupants of land within this commonwealth." The act forfeits to the commonwealth, without inquisition or judgment, every tract of land of more than one hundred acres, unless the proprietor thereof should, if it be wood land, cause five acres to be cleared, fenced and tended, and ten acres for every

thousand to be belted before August 1, 1825. If the greater part of the lands was in the barrens, then ten acres for every thousand were required to be enclosed by good fence. The Supreme Court of that State, in that case, on page 489, held that act unconstitutional in the following language:

"I am unwilling, however, to concede, that the Legislature can, under the pretext of promoting the interest of the State, control and direct the citizen in the use he shall make of his private property. I subscribe to the maxim *sic utere tuo, ut alienum non laedas;* and I admit the power to punish for an injury done to individuals or the public. But I deny, that the Legislature can constitutionally prescribe, under color of preventing public or private mischief, the quantity of labor the citizen shall perform on his farm, the kind of improvements he shall make, and the time within which they must be constructed. The toleration of such power on the part of the government would be conceding to it the right of controlling every man, and directing what road he shall travel in the 'pursuit of happiness.' Thus the freedom of the citizen would be lost in the despotic will of the government, and, under the semblance of liberty, we should have the essence of tyranny. . . .

"If the power to forfeit lands for non-improvement exists, it would only require an act prescribing irksome or impossible conditions, to strip the citizen of all his property. In regard to the power, there is no difference between real and personal estate. In the nature of things, there is as much propriety, it seems to me, in forfeiting a horse to the government, because his proprietor does not curry and rub him well, or break him to labor gently in the gear, as there is in forfeiting land because the owner does not choose to clear and cultivate a part, and deaden the trees growing on another part. Such interferences on the part of the government with the private affairs of in-

dividuals would ever be a source of discontent, if they were expressly tolerated by the Constitution. Their obvious impolicy is a strong reason in favor of the conclusion to which I have arrived. The members of the convention, anxious to place the enjoyment of life, liberty, and property, upon secure foundations, cannot well be imagined to have left all property subject to the absolute and arbitrary control and disposition of the Legislature.''

The Latin maxim quoted in the opinion by Judge Underwood shows that the court recognized the fundamental principle of law which requires every one to so use his property that he will not thereby do injury to others or to their property.

According to this recognized rule, if plaintiff could not use the six feet of its lots facing on side streets, and the fifteen feet facing on front streets for billboard purposes without jeopardizing the safety of the citizen upon the street, imperiling the health of the inhabitants, or corrupting the morals of the people, then it would have no legal right to use those portions of said lots for those purposes.

The case of Wright v. Hart has but little or no bearing upon either side of the question here involved.

The case of People v. Green, supra, involved the constitutionality of a statute authorizing a municipal corporation to prohibit the posting of any advertisement whatever upon fences inclosing private property, fronting on, or adjacent to, any public park in said city. That statute was held unconstitutional, and rightfully so, for the reason that it prevented the posting of all advertisements of every character, in the manner stated, when there was no pretense but what proper advertisements could be there posted without injury being done to the morals, health or safety of the city. In other words, the question of nuisance constituted no element in that case.

In the case of Commonwealth v. Boston Advertising Company, supra, the Legislature passed an act authorizing the park commissioners to make such reasonable rules and regulations respecting the display of signs, posters or advertisements in or near to and visible from public parks and parkways entrusted to their care as they may deem necessary for preserving the objects for which such parks and parkways are established and maintained. In pursuance to that act, the commissioners adopted a rule forbidding the maintenance of business signs so near a parkway in the care of the commissioners as to be plainly visible to the naked eye of persons in the parkway. The Supreme Court of Massachusetts held that rule to be unconstitutional, because it took private property for public use without compensation. That case, in our opinion, was also correctly decided, for the reason that there were no facts in that case which tended to show that the maintenance of business signs at the forbidden places was dangerous to the safety or detrimental to the health or morals of the inhabitants of the city.

The case of Bostock v. Sams, supra, bears only indirectly or remotely upon the proposition under consideration. The question there was, did a lot owner have the legal right to erect a building on a certain fashionable street in the city of Baltimore for the purpose of maintaining therein a zoological garden? No question of public danger was involved.

In the case of Bill Posting Co. v. Atlantic City, supra, the Supreme Court of New Jersey simply held that an ordinance which prohibited the erection of signs upon private property, without regard to whether such signs were dangerous to the public safety, was invalid, because it attempted to appropriate private property for public use without compensation.

To the same effect is the case of Passaic v. Paterson B. P. Co., supra.

Those decisions also meet with our approval; but

they also recognize the rule which authorizes the city to enact ordinances regulating the construction of signs and billboards when dangerous to public safety, etc.

The case of Western Co. v. Knickerbocker Co., 103 Cal. 111, has no application to this case. That case involved the question of the right to erect party walls and partition fences; and no question as to their safety was involved.

In discussing this question, the Supreme Court of California, in the case of Varney v. Williams, supra, said: "If the billboards constituted a public nuisance, a court of equity would refuse any writ designed to perpetuate their maintenance, regardless of the validity of the ordinance under which defendants assume to proceed. [McQueen v. Phelan, 4 Cal. App. 695, 88 Pac. 1099.] But the finding that the boards did constitute a nuisance is attacked as contrary to the evidence. It is not contended by respondents that any nuisance in fact existed, unless it resulted from the mere circumstance that structures were maintained contrary to the terms of the ordinance. The single question for decision, therefore, is whether the enactment of this ordinance was within the legislative power of the town of East San Jose. Except for the limited exemption conferred by section 3, the effect of the ordinance is to absolutely prohibit the erection or maintenance of billboards for advertising purposes. There is no attempt to restrict the operation of the enactment to billboards that may be insecure or otherwise dangerous, or to advertising that may be indecent. The town trustees have undertaken to make criminal the maintenance of any billboard, however securely it may be built, and however unobjectionable may be the advertising matter displayed upon it. Such prohibition, involving a very substantial interference with the rights of property, can be justified, if at all, only to the extent that the subject-matter of the legislation is embraced within the police power of the State. Bearing in mind that the

ordinance does not purport to have any relation to the protection of passers-by from injury by reason of unsafe structures, to the diminution of hazard of fire, or to the prevention of immoral displays, we find that the one ground upon which the town council may be thought to have acted is that the appearance of billboards is, or may be, offensive to the sight of persons of refined taste. That the promotion of aesthetic or artistic considerations is a proper object of governmental care will probably not be disputed. But, so far as we are advised, it has never been held that these considerations alone will justify, as an exercise of the police power, a radical restriction of the right of an owner of property to use his property in an ordinary and beneficial way. Such restriction is, if not a taking, *pro tanto* of the property, a damaging thereof, for which, under section 14 of article 1 of the Constitution, the owner is entitled to compensation.''

In the case of Bryan v. City of Chester, 212 Pa. St. 259, the Supreme Court of Pennsylvania decided two questions, first, that a municipality had no authority to enact an ordinance prohibiting the erection of billboards on private property simply because such boards were unsightly, or may create a nuisance; and, second, that such municipality may prohibit the erection of insecure billboards within its limits, prevent the exhibition of immoral or indecent advertisements or pictures, and protect the community from any actual nuisance resulting from the use of them. That case rests upon sound doctrine also; but there is nothing contained therein which militates against the rule which authorizes municipalities to enact ordinances which prescribe reasonable standards and rules, in the nature of minimum requirements, by which the erection of all insecure and dangerous billboards are prohibited from being erected.

It must be remembered that there are thousands of these billboards in the city, and they are in the very

St. Louis Gunning Co. v. St. Louis.

nature of things temporary structures, generally consisting of one frail narrow line of boards nailed to upright posts set in the ground, and cheaply constructed. They are not like ordinary buildings with at least four outer walls, covered over, and every part holding, bracing and weighting down every other part thereof. Before such a building can be blown down, the walls thereof must be crushed in, which are supported and braced by each other, or the entire building must be turned over, which would require a wind strong enough to lift the roof and three sides thereof sufficiently high from the ground to turn it over. Common experience teaches us that nothing short of a tornado will do either. But not so in the case of a billboard. There are no walls or roof to support and strengthen it, nothing but the braces in the rear thereof to lend them support, and they, as a rule, are the boards themselves. Most of them are so constructed that their bodies or wings are wide spread like the sails of a great vessel and they gather the winds, and if not properly and securely constructed they will more than likely be blown down when the first high wind strikes them, and inflict injury upon those who are upon the streets. Not only that, but if they are not constructed according to reasonable regulations, then in the very nature of things, as before shown, they become the evil wing which shelters, incubates and gives life and being to the nuisances before mentioned. It is axiomatic that if a municipality has the authority to abate an existing nuisance, then it must likewise have the power to adopt all reasonable rules and standards by which their creation will be prevented.

None of those things could be accomplished by the city of St. Louis if she is not permitted in the first instance to adopt reasonable rules and standards by which billboards are to be constructed, thereby rendering them safe and destitute of nuisance incubation.

In the case of State v. Whitlock, 149 N. C. 542, BROWN, J., of the Supreme Court of North Carolina, in speaking for the court upon this subject, said:

"While this is true, yet it is fundamental law that the owner of land has the right to erect such structures upon it as he may see fit, and put his property to any use which may suit his pleasure, provided that in doing so he does not imperil or threaten harm to others. [Tiedman, Lim., 439.]

"All statutory restrictions of the use of property are imposed upon the theory that they are necessary for the safety, health or comfort of the public, but a limitation which is unnecessary and unreasonable cannot be enforced. Although the police power is a broad one, it is not without its limitations, and a secure structure upon private property, and one which is not *per se* an infringement upon the public safety, and is not a nuisance, cannot be made one by legislative fiat and then prohibited. [Yates v. Milwaukee, 10 Wall. 497; 1 Dillon, Mun. Corp. 374.]

"It is undoubtedly within the power of the corporate authorities of the city of Asheville to prohibit the erection of insecure billboards or other structures along the edge of the public streets, or so near as to be a menace, to require the owners to maintain all structures so located in a secure condition, and to provide for inspection and removal at the owner's expense, if condemned as dangerous. The city authorities may also adopt regulations as to the manner of construction of billboards, so as to insure safety to the passers-by, but the prohibition of structures upon the lot line, however safe they may be, is an unwarranted invasion of private right, and is so held to be by all the courts which have passed upon the precise question, as we are now advised.

"In the case of City of Passaic v. Paterson Bill Posting Co., it is held that a city ordinance requiring that signs or billboards shall be constructed not less

than ten feet from the street line is a regulation not reasonably necessary for the public safety, and cannot be justified as an exercise of the police power. [72 N. J. Law, 285.] In support of the decision is cited Crawford v. Topeka, 51 Kan. 756, and Commonwealth v. Boston Advertising Co., 188 Mass. 348, cases directly in point. In that case the New Jersey court says: 'The very fact that this ordinance is directed against signs and billboards only and not against fences, indicates that some consideration other than the public safety led to its passage.'

"The court attributes the adoption of the ordinance to aesthetic considerations, rather than to an exclusive regard for the public safety, and says: 'Aesthetic considerations are a matter of luxury and indulgence rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation.' "

The conclusion reached in this case, as in several others cited, is based upon the fact that the court thought that the ordinance which required billboards to be constructed not less than ten feet from the street line was a regulation of private property not reasonably necessary for the public safety. In passing, it should be observed that there was no showing made in that case, as was in the case at bar, as to the necessity for such regulations in the city of St.Louis. This subject will receive further consideration later on.

In Crawford v. City of Topeka, 51 Kan. 761, the Supreme Court of Kansas, in speaking of this same question, said:

"We think the ordinance is not reasonable nor valid; hence the ruling of the court cannot be sustained. As has been seen, it prescribes the erection or use of any structure near the lot line for advertising purposes, no matter how substantial and secure it may be. Municipalities may be and are vested with large

235 Sup.—12

powers in protecting the health and safety of the people, and in promoting the welfare of the public. They have been given authority to prevent and remove nuisances, to protect the walks and ways, and, where they are dangerous, may compel the owners of adjacent property to erect and maintain railings, safeguards and barriers along the same. They may enter and inspect all dwelling houses, yards, inclosures, and buildings, to ascertain whether any of them are in a dangerous state, and may take down and remove such structures as have become insecure or dangerous; and, further, may require the owners of insecure and dangerous buildings and other erections to render the same secure and safe, at the owner's cost. They may regulate the use of the streets and public grounds, and may regulate or prohibit awnings and awning posts, and all other structures projecting upon or over the street or sidewalk. Fire limits may be established, within which the erection of wooden buildings or structures which would readily communicate fire may be prohibited. [Gen. Stat. 1889, p. 555.] In none of these provisions do we find anything which warrants the city to prohibit the erection of safe and substantial structures on any portion of a lot, if, indeed, any such power can be given. In general, it may be said that the owner of real estate has the right to erect such buildings or other structures upon it as he may please, and put the premises to any use which may suit his pleasure, providing that he does not in doing so imperil or threaten harm to others. [Tied. Lim., 439.] All statutory restrictions of the use of property are imposed upon the theory that they are necessary for the safety, health or comfort of the public; but a limitation without reason or necessity cannot be enforced. In what way can the erection of a safe structure for advertising purposes, near the front of a lot, endanger public safety any more than a like structure for some other lawful purpose? Why does

the posting or painting of an advertisement upon a secure wall or structure render it insecure? An owner may desire to use a structure or billboard for an inclosure of his lot, as well as for posting advertisements. In one instance that was the desire and purpose of the owner in this case. If the wall or inclosure was ten feet high, then under the ordinance the owner would be required to set it back fifteen feet from the front of the lot. What reason is there for the surrender or loss of the use of that portion of the lot? Or why should the pasting of a piece of paper upon a secure inclosure make such a loss necessary? Although the police power is a broad one, it is not without limitations, and a secure structure which is not an infringement upon the public safety, and is not a nuisance, cannot be made one by legislative fiat, and then prohibited. [Yates v. Milwaukee, 10 Wall. 497; 1 Dillon Mun. Corp. 374.] It is doubtless within the power of the city to prohibit the erection of insecure billboards or other structures, require the owners to maintain them in a secure condition, and to provide for their removal at the expense of the owners in case they become dangerous. Perhaps regulations may be made with reference to the manner of construction so as to insure safety, but the prohibition of the erection of structures upon the lot lines, however safe they might be, would be an unwarranted invasion of private right, and is without legislative authority. In Langan v. City of Atchison, 35 Kan. 318, an insecure billboard which had been fastened to the sidewalk fell upon one who was passing, and injured him. It appeared to have been in a weak and insecure condition for some time, and that the officers of the city knew that it was not erected in a safe and proper manner, and before its fall that it was in a condition to endanger the persons passing upon the sidewalk. It was held that the city was liable in damages for the injury, upon the theory that it was its duty to keep the streets and walks in a safe condi-

tion for persons passing over and along them. It was further held that it was the duty of the corporate authorities to remove or abate any nuisance, and that, under the power given to the city to prevent and remove nuisances, and to regulate all structures projecting upon or over the streets or walks, it was bound to remove or protect the sidewalk from the imperfectly constructed and insecure billboard standing so near the sidewalk as to fall upon it. This authority sanctions the regulation of such structures so far as to make them secure; but nothing is said which would justify the prohibition of the erection of structures that are absolutely safe. None of the structures proposed to be removed extended beyond the lot, and hence are not to be regarded as if they projected over the street. The regulations as to the erection and maintenance of such structures may be made sufficiently rigid to fully protect the public; but they must be reasonable, and when they pass beyond the bounds of reason and necessity, and impair private property rights, they must be pronounced invalid. The unreasonableness of the ordinance in question is easily seen when it is considered that the mere posting of a harmless paper upon a structure changes it from a lawful to an unlawful one. A person may erect a fence around his lot without violating the ordinance; but just as soon as an advertisement is posted or painted thereon it is brought within the condemnation of the ordinance, and the owner is liable to prosecution and punishment.''

This opinion was also based upon the unreasonableness of the ordinance; and because the real purpose thereof was to prohibit this class of advertisements within the city limits because of the unsightliness of the billboards. Likewise in this case, as in the North Carolina case, supra, there was no showing made as to the reasonableness of the ordinance under consideration.

In the case of Chicago v. Gunning System, 214 Ill. 628, the Supreme Court of Illinois held the ordinance there under consideration void because it absolutely prohibited the erection of all billboards along any boulevard or pleasure drive, or along any street where three-fourths of the buildings are residences, without the consent, in writing, of at least three-fourths of the residents and property owners on both sides of the street in the block where the board is to be erected. That decision was sound, both upon principle and authority. The prohibition did not depend upon the question of public safety, but solely upon the pleasure of the three-fourths of the property owners residing along the street.

The same principle we now have under consideration is involved in that class of cases known as "house signs" and "sky signs," attached to the walls of or erected upon the roofs of buildings, which come under the provisions of section 81 of said ordinance. The case of People ex rel v. Murphy, 195 N. Y. 126, is of that class. That case more strongly presents plaintiff's theory of this branch of its case than any it has cited, and for that reason I quote fully therefrom. The facts of that case as stated by the court are as follows:

"From such application and the accompanying papers it appears that the building upon which it is proposed to erect the sign is an office building ten stories high, and that it is proposed to erect the sign in compliance with the ordinances and regulations of the city of New York except that the proposed sign is more than nine feet in height above the front wall or cornice of the building. The proposed sign would be five feet six inches above the roof and the top thereof would be twenty feet six inches above said front wall or cornice. It is proposed to erect said sign between forty and fifty feet back from the building line on Twenty-second street and to face it northwest and substantially in the direction of the rear of the building.

It is intended for the display of advertisements to be seen from points in the city northwest of said building. The defendant refused to approve the specifications, plans and application, or to issue a permit for the erection of said sign, solely because of an ordinance of said city limiting the height of sky signs to nine feet above the front wall or cornice of the building on which it is to be erected. The application was then made for a peremptory writ of mandamus to compel the issuing of such permit. The motion being denied, an appeal was taken to the Appellate Division where the order was not only reversed but a writ was granted commanding the defendant 'to examine the plan and application filed by the relator and described in its petition with reference to the material to be used and the method of construction thereof and as to the safety thereof, and if he shall find that the said structure is to be built of proper materials and in a proper manner and that the proposed structure is safe and secure, then to approve said application and issue a permit thereon.'

"The consent of the owner of said real property is based upon a substantial consideration paid to her therefor and the relator has entered into a contract with an advertiser for the use of such sign, the consideration for which is also a substantial sum."

In the discussion of the question involved, the court used this language:

"It is not open to controversy that if the relator is not allowed to erect and maintain such sign the owner of said building and the relator as her lessee is deprived of some rights in the beneficial use and free enjoyment of private property without direct compensation.

"The ordinance of the city of New York to be construed on its appeal defines a sky sign, and as so defined it is: 'Any letter, word, model, sign, device or representation in the nature of an advertisement an-

nouncement or direction supported or attached, wholly or in part over or above any wall, building or structure shall be deemed to be a sky sign.'

"The ordinance (section 144 of the Building Code of the city of New York) also provides as follows: 'Sky signs shall be constructed entirely of metal, including the uprights, supports and braces for same, and shall not be at any point over nine feet above the front wall or cornice of the building or structure to which they are attached or by which they are supported. All fences, signs, billboards and sky signs shall be erected entirely within the building line and be properly secured, supported and braced and shall be so constructed as not to be or become dangerous. Before the erection of any fence, sign, billboard or sky sign shall have been commenced a permit [for] the erection of the same shall be obtained from the Superintendent of Buildings having jurisdiction as provided in part 2, section 4 of this Code. Each application for the erection of any fence, sign, billboard or sky sign shall be accompanied by a written consent of the owner or owners or the lessee or lessees of the property upon which it is to be erected.'

"It is not the erection over and above any wall, building or structure that is prohibited, but the thing constructed plus the letter, word, model, sign, device or representation in the nature of an advertisement, announcement or direction painted or pasted thereon or attached thereto.

"So far as appears there is no absolute limitation upon the height that tanks, towers or chimneys can be erected, nor as to flagpoles, balustrades, finials or other structures ornamental or useful. If it appeared in the relator's application that the structure proposed to be erected was not for the purpose of advertising, but for any other purpose, fancy or whim, it would not come within the prohibitive clause of the ordinance. A further examination of the ordinance shows that it re-

lates wholly to erections within the building line and upon private property. It is in no way affected by the rules of law relating to street or municipal property. As private property the owner of the building on which it is proposed to erect the structure can use it in any way that to her may seem desirable, except as such use is subject to the implied obligation resting upon every owner of property to use it so as not to interfere with the rights of others, and also subject to such restrictions as are necessary for the public welfare.

"The police power, so difficult to define, but so frequently invoked, is confined to such reasonable restrictions and prohibitions as are necessary to guard public health, morals and safety, and to conserve public peace, order and the general welfare. Regulations and ordinances within such general definition are valid. The city may make and enforce such regulations and ordinances, although they interfere with and restrict the use of private property. Compensation for such interference with and restriction in the use of property is found in the share that the owner enjoys in the common benefit secured to all.

"Does the ordinance, so far as it relates to sky signs, come within the police power, or is its purpose simply to prevent or restrict a lawful business which it is alleged has been extended until it has become offensive to good taste?

"It is not asserted by the city that a sky sign, as defined in the ordinance or as proposed by the relator, has any relation whatever to or effect upon public health or public morals. The only alleged reason for the passage and enforcement of the ordinance is that a structure upon which advertisements are to be placed constitutes a danger by reason of the possibility of its falling into a public street. The danger, so far as it interferes with firemen in passing over the roof of a building, is apparently avoided in the case now before

us by the provision that the structure on which the sign is to be erected will have a clear space of five feet and six inches between the roof and the bottom of the proposed structure. A structure nine feet in height would seem to be as great an interference with firemen in passing over the roof as one erected at a greater height.

"An ordinance drawn to protect the public from physical danger should in terms bear some evidence of such purpose. So far as the ordinance in question relates to sky signs, it is general in its terms and it is as prohibitive in remote parts of the city as in the congested parts thereof, and to a structure erected at a safe distance from any street or public place as one erected upon the front wall or cornice of a building situated upon the building line of a public way. The prohibited height is also based upon an arbitrary measurement above the front wall or cornice of the building, notwithstanding the height of the building at the place where it is proposed to erect the structure may be much less or more than at such front wall or cornice of the building. The prohibition is, therefore, not dependent upon the dangerous location of the structure nor is it based upon the height or safety of the particular thing constructed.

"But the more serious objection to the ordinance is in the fact that the absolute prohibition is confined wholly to sky signs as they are defined therein. The physical danger to the public does not arise from the advertisements. The advertisement, announcement or direction bears no relation to the safety of the structure itself. It is not the structure, therefore, that is prohibited. Would a structure of any description be more dangerous if it bore the words 'Omega Oil?' Could a city enact and enforce an ordinance limiting the height of all buildings therein which are painted a particular color and leave unrestricted the height to which a building could be erected so long as it was un-

painted or painted a color other than the particular one
specified? Such an ordinance would bear evidence
in itself that it was not enacted for any purpose within
the police power. It appears from the ordinance in
question that it was not enacted in the interest of pub-
lic health, morals or safety or to conserve public peace,
order and general welfare, and the ordinance so far as
it relates to sky signs is arbitrary and unauthorized.

"This court in City of Rochester v. West, 164 N.
Y. 510, sustained an ordinance forbidding the erection
of billboards more than six feet in height without the
consent of the common council. The court, referring
to the charter of the city, say: 'We think this statute
conferred upon the common council of the city au-
thority to regulate boards erected for the purpose of
bill posting, so far, at least, as such regulation was
necessary to the safety or welfare of the inhab-
itants of the city or persons passing along its streets.
. . . It is obvious that its purpose was to allow the
common council to provide for the welfare and safety
of the community in the municipality to which it ap-
plied. If the defendant's authority to erect billboards
was wholly unlimited as to height and dimensions, they
might readily become a constant and continuing dan-
ger to the lives and persons of those who should pass
along the street in proximity to them.' [P. 513.]

"In Commonwealth v. Boston Advertising Com-
pany, 188 Mass. 348, the court held invalid an ordi-
nance or regulation relating to signs, posters or ad-
vertisements, and say: 'The plain and intended pur-
pose of the rule is to prohibit the use of land near
public parks and parkways for advertising. . . .
Rules intended to prohibit advertisements of indecent
or immoral tendencies, or signs dangerous to the
physical safety of the public, no doubt would be rea-
sonable within the meaning of the statute and valid.
We think the case of Rochester v. West, 164 N. Y. 510,
was decided and can rest only on this ground.'

"We quote from the head note in Bryan v. City of Chester, 212 Pa. St. 259, which fairly states the holding of the court as stated in the opinion as follows: 'A municipality has no power to enact an ordinance forbidding citizens to erect billboards on their own property merely because such boards are unsightly or may create a nuisance. Any citizen against whom such an ordinance is sought to be enforced is entitled to the protection of a court of equity. Under the police powers of a municipality it may prohibit the erection of insecure billboards within its limits, prevent the exhibition from secure ones of immoral or indecent advertisements or pictures, and protect the community from any actual nuisance resulting from the use of them, but it can go no further. All statutory restrictions of the use of property are imposed upon the theory that they are necessary for the safety, health, or comfort of the public, but a limitation without reason or necessity cannot be enforced.'

"In Crawford v. City of Topeka, 51 Kan. 756, the court, construing an ordinance that provided that no billboard or structure for advertising purposes should be erected unless at a certain distance from the line of the street, says: 'The unreasonableness of the ordinance in question is easily seen when it is considered that the mere posting of a harmless paper upon a structure changes it from a lawful to an unlawful one. A person may erect a fence around his lot without violating the ordinances; but just as soon as an advertisement is posted or painted thereon it is brought within the condemnation of the ordinance, and the owner is liable to prosecution and punishment.'

"In Bill Posting Sign Co. v. Atlantic City, 71 N. J. L. 72, the court held that an ordinance forbidding the erection of signs upon private property in Atlantic City, without regard to whether such signs may be dangerous to public safety, is invalid, and in the opinion the court says:  'The recognition of a power so

wide would bestow upon the lawmaker the right to invest cities with authority to control the size and style of buildings which should be erected upon private property where the public safety was in no wise involved.'

"In City of Passaic v. Paterson Bill Posting Advertising &. Sign Painting Co., 72 N. J. L. 285, the court, referring to an ordinance, says: "The very fact that this ordinance is directed against signs and billboards only, and not against fences, indicates that some consideration other than the public safety led to its passage. It is obvious from the face of the ordinance that the object of the first section was not to secure the public safety; that section contains no reference to a dangerous condition of billboards, while the second section expressly undertakes to deal with those that become dangerous. . . . Aesthetic considerations are a matter of luxury and indulgence rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation.'

"In City of Chicago v. Gunning System, 214 Ill. 628, the court, in condemning an ordinance prohibiting certain billboards, say: 'The purpose . . . seems to be mainly sentimental, and to prevent sights which may be offensive to the aesthetic sensibilities of certain individuals residing in or passing through the vicinity of the billboards.'

"A municipality, in enacting ordinances relating to the safety of the public, may undoubtedly make reasonable classifications among structures with reference to their location and the necessity or importance thereof without offending against the provisions of the Fourteenth Amendment of the Federal Constitution. The classification, as well as the ordinance itself, must be based upon some necessity justifying the exercise of the police power. It has been said that the police power of a municipality is allied to the right of self-

preservation in an individual. In exercising such power or right, the purpose thereof, and the limita-tions thereon, should not be forgotten. The classifica-tion of the sky sign by the ordinance in question is dependent upon the letter, word, model, sign, device or representation in the nature of an advertisement, an-nouncement or direction and it has no direct relation to the safety of the public. An ordinance which pur-ports to legislate for public safety must tend in some appreciable way to that end. Unless there is a sub-stantial connection between the assumed purpose of the ordinance and the end to be accomplished, such ordinance is unenforceable. [Matter of Jacobs, 98 N. Y. 98; People v. Orange Co. Road Cons. Co., 175 N. Y. 84; People v. Gillson, 109 N. Y. 389; Health De-partment v. Rector, 145 N. Y. 32; People v. Ewer, 141 N. Y. 129; Fisher Co. v. Woods, 187 N. Y. 90.]"

While I recognize the fact that the court which delivered that opinion is one of the greatest and strongest courts in the world, yet with all due re-spect and deference thereto, in my opinion, it is un-sound in several particulars.

The first criticism I have to offer thereto regards that part which holds, in substance, that the object of the ordinance was not to prohibit the erection of any such sign over and above any wall or building, but the thing condemned thereby was "the letter, word, model, sign, device or representation in the nature of an advertisement, announcement or direction painted or pasted thereon or attached thereto."

As I read the ordinance, as set out by the court, there is no language contained therein which warrants or supports the construction placed upon it by that court. And, clearly, the reason which prompted the Municipal Assembly to limit the application of the ordi-nance to house signs, sky signs, etc., was because there is no other class or character of structures attached to the walls of buildings or erected upon the roofs

thereof except those which are used for advertising purposes. So, while the lawmakers by using the language contained in that ordinance technically limited its application to a special class of structures, namely, boards upon which advertisements are painted or pasted; yet in truth and in fact the ordinance is not special and limited in its operation, but it embraces every structure which is erected in the city of the character mentioned, for the very good reason, as before stated, that there are no other such structures erected and used for any other purpose than those named in the ordinance.

It is true, the court in the New York case mentions in this connection "tanks, towers, chimneys, flag poles, balustrades and finials," yet we will presently undertake to point out and show that they have no connection whatever with billboards, house signs or sky signs, and that they do not belong to the same general class of structures to which the latter belong, either in character, durability, strength or safety, and that the same nuisances cannot flow from them that are incident to the former class of structures, when erected upon the ground. But, however that may be, clearly there is nothing contained in the ordinance involved in the case at bar which would warrant this court in holding that the erection of billboards and house signs constituted the subject of this legislation simply because they were unsightly and were used for advertising purposes. Clearly, the ordinances in question were enacted to protect the public from injury and to prevent and abate the nuisances which are almost necessary incidents thereto as now constructed and maintained.

Said opinion is also subject to criticism for holding said ordinance invalid as it relates to sky signs for being general in terms and "prohibitive in remote parts of the city as in the congested parts thereof, and to a structure erected at a safe distance from any

street or public place as one erected upon the front walls or cornice of a building situate upon the building line of a public way.'' While as an abstract proposition of law that holding is sound, it can never, in the ordinary course of business conduct, be applied to a concrete case, for the reason that sky signs are never attached to the walls of or erected upon the roofs of buildings standing in sparsely settled and remote parts of a city. It is common knowledge, and universal observation shows, that such sections of cities are totally barren of all house signs and sky signs. In all such portions of the city this class of advertisements are displayed upon billboards erected upon the ground; and sky signs are never resorted to except in densely populated districts, where there is no room on the ground for billboards.

While it is true we often see advertisements pasted or painted upon the walls and roofs of out-buildings and upon some business houses without the intervention of house signs or sky signs, yet this ordinance has no more application thereto than they have to the horses and cattle occupying the one or the stock of goods contained in the other. The ordinance is directed at the house signs and sky signs upon which such advertisements are painted or pasted, and not to the paint or posters themselves. Of course it is possible to erect house signs or sky signs upon buildings in the country and sparsely settled portions of cities, but such a thing is so highly improbable and so seldom done that such a mere possibility surely should not form a substantial basis or a valid reason for holding such a wise and beneficient ordinance as this one is void for being unconstitutional or unreasonable. If, however, such a condition of things should in the course of the complex events of human conduct ever present itself to this court for determination, it will then be time to give it the consideration its importance demands.

The fact that said ordinance does not embrace within its provisions, nor limit the height of tanks, towers, chimneys, flag poles, balustrades, finials or other structures useful or ornamental, should not, in our opinion, condemn the same, for the reason they do not belong to the same natural and general class of subjects to which house signs, sky signs and billboards belong. The latter belong exclusively to a class of their own, on account of their character, structure and inherent weakness; and on account of their temporary character they must be cheaply and insecurely constructed. Should they be required to be constructed with the same permanency, strength and security with which ordinary buildings are constructed, then that fact alone would destroy their commercial value and put them out of business, for the cost of construction would greatly exceed the amount of the income that would be derived therefrom.

As a rule billboards are erected upon ground temporarily vacant, generally upon property which is being offered for sale, or while the owners are preparing to build thereon; or where the property belongs to some estate which is in litigation, or for some similar reason the property is only temporarily vacant. In all such cases, when the property is sold, the lot is built upon, the litigation settled or the estate is partitioned, the billboard thereon generally must go. For this reason billboards must also be temporary structures, cheaply built and more or less insecure on that account. The same is true of house signs and sky signs, probably in a less degree, however, than in cases of billboards. The leases for all those purposes must in the very nature of the business be of short duration, as compared to the duration of leases for all other class of buildings. And it should be borne in mind that the Municipal Assembly enacted this ordinance to control and regulate these structures as they really

are, and not as if they were constructed as other build-
ings are.

If not for the reasons before stated, then for some
other reason house signs, sky signs and billboards over
six or eight feet in height are not as strongly built as
are tanks, towers, chimneys, etc. The latter are hollow
and are supported by four walls or timbers which sup-
port and brace each other, thereby greatly increasing
their strength and security over a billboard, a narrow
straight wall extending high into the air and sup-
ported only by rear braces. The strength of the for-
mer and the comparative weakness of the latter are
shown by a bar of steel. For instance, a bar of steel
an inch in thickness and six inches in width, or six
feet for that matter, ten feet in height, would not, I
dare say, more than support its own weight should it
be raised to a vertical position; but if you should
take the same bar and bend it in the center the entire
length thereof to a right angle so as to form a bar
known as ''angle iron,'' and then raise it to the same
position before mentioned, it would then not only
support its own weight, but it would support many
times that weight; and upon the same prin-
ciple if you should take the same bar of steel and
form out of it a hollow square or tube, then you would
again increase its strength many times over what it
would be if left in the shape of angle iron. For in-
stance, take a case which came under my personal
observation, in fact I was one of three who constituted
a committee which had under charge the construction
of a self-supporting steel chimney, in a section of the
country proverbial for its high winds, one hundred
and twenty-five feet in height. The steel consisted of
plates one-half inch in thickness and of various dimen-
sions. They were so riveted together as to form a
tube about ten feet in diameter at the base and about
six feet at the top. The chimney was firmly anchored

to a solid concrete base, and was required to be of sufficient strength to withstand wind storms of such force and violence as would cause the top of the chimney to oscillate about three and one-half feet beyond a perpendicular line. (I speak from memory only and do not attempt to give exact facts, but have stated them approximately). By forming this steel into a tubular stack or chimney, it was made sufficiently strong to withstand the force of the strongest wind storms known to that section, which is saying a great deal. Now, suppose we should sever the tube on one side from the top to the base and open it out so as to form a straight vertical wall one hundred and twenty-five feet in height, thirty feet wide at the base and gradually narrowing to a width of eighteen feet at the top, with a thickness of only one-half inch. We would then have a structure similar to billboards, house signs and sky signs, except as to rear supports; but with the supports added, could it then be seriously contended that such wall would belong to the same class of structures to which chimneys, tanks and towers belong, as it was held to be by the Court of Appeals of New York in the case of People ex rel. v. Murphy, supra? We think not. When the high winds of that section would strike such a wall, if it was braced no more securely in proportion than are plaintiff's billboards, etc., are supported, it would not withstand that force one moment. And the same is true of chimneys, tanks and towers—the four walls of each support one another and are thereby rendered many times stronger than any one wall thereof would be if standing alone.

If plaintiff should be required to construct its billboards, house signs and sky signs as permanently, securely and safely as chimneys, tanks and towers are constructed, then there never be another one of them constructed, for the simple reason that the cost of the labor and materials which would be required to so

construct them would be so great that they would not be remunerative.

And as to flag poles and balustrades, they fall in neither of the above classes. The pole is strong and has no broad surface to catch and gather the high or strong winds, and the same is true of balustrades; it is open work and affords plenty of spaces through which the wind may pass almost unobstructed. While upon the other hand, these house signs, sky signs and billboards present a long, high and solid surface against which the winds blow with all their unabated fury and force during storms and hurricanes. They must be built strong enough to withstand that force, or be blown down. There is no protection the wind can go around, as is true in the case of a flag pole, or pass through the open spaces, as in the case of a balustrade.

From these observations, it seems to me that the reasoning of the New York Court in the case of People ex rel. v. Murphy, supra, is unsound in holding the ordinance there under consideration invalid because it was class legislation, in that it did not include within its provisions chimneys, towers and tanks.

Counsel for defendants cite in support of their contention, that said ordinance No. 22022 is valid, the following cases: City of Rochester v. West, 164 N. Y. 510; In re Wilshire, 103 Fed. 620; Gunning System v. Buffalo, 75 App. Div. (N. Y.) 31; Rideout v. Knox, 148 Mass. 368; Whitmire v. Buffalo, 118 Fed. 773.

In the case of City of Rochester v. West, supra, the Court of Appeals of New York upheld the validity of a statute of New York prohibiting the erection of billboards exceeding six feet in height, except with the permission of the common council, after notice in writing of the application for the permit to the owners, occupants or agents of all houses and lots within a distance of two hundred feet from where such billboards are to be erected. That case is a direct author-

ity supporting the position of defendants. It recognizes the authority of the Legislature to fix the height of billboards at six feet, which is absolutely binding upon the property owner and advertiser until the common council raises the bar; and if the latter body should decide not to do so, then, of course, no billboard in excess of six feet in height could ever be constructed in that city.

And in the case of In re Wilshire, supra, the circuit court of the United States for the Southern District of California, held that the city of Los Angeles, under the exercise of its general police powers, could, by ordinance, regulate the height of billboards mentioned therein within reasonable limits, and that the ordinance so limiting the height of such structures at six feet from the ground or sidewalk was so clearly reasonable as to justify a court in holding it void as violative of constitutional rights of property. The ordinance there upheld was much more drastic in its provisions and regulations than is the ordinance under review in the case at bar. Here the height is limited to not exceeding fourteen feet above the surface of the ground—more than twice the height fixed by the Los Angeles and Buffalo ordinances.

In the case of Gunning System v. City of Buffalo, 75 N. Y. App. Div. 31, the court said: "We do not deem it necessary to enter into an extended review of the evidence or consideration of the law, in view of the decision of this court and the Court of Appeals in the case of City of Rochester v. West, 29 App. Div. 125, affd. 164 N. Y. 510. It was there held that the Legislature had power to authorize the city to pass a similar ordinance, that the charter authorized the adoption of the ordinance, and that it should be enforced. In that case the charter expressly authorized the passage of such an ordinance. We think like authority, though not in express terms, was given to the city of Buffalo in its charter. In the Rochester-West case the court

St. Louis Gunning Co. v. St. Louis.

said that the obvious purpose of the Legislature was to allow the city of Rochester to provide for the wel fare and safety of the community in the municipality, and that the ordinance there in question was within such purpose.''

The case of Rideout v. Knox, 148 Mass. 368, while not directly in point, yet the principle there involved is applicable here. There the subject-matter of the legislation was what is known as the ''devil's fence;'' and in discussing that case the Supreme Court of Massachusetts said:

''At common law, a man has a right to build a fence on his own land as high as he pleases, however much it may obstruct his neighbor's light and air. And the limit up to which a man may impair his neighbor's enjoyment of his estate by the mode of using his own is fixed by external standards only. [Walker v. Cronin, 107 Mass. 555, 564; Chatfield v. Wilson, 28 Vt. 49; Phelps v. Nowlen, 72 N. Y. 39; Frazier v. Brown, 12 Ohio St. 294; Martin, B., in Rawstron v. Taylor, 11 Exch. 369, 378, 384. See Benjamin v. Wheeler, 8 Gray 409, 413.]

''But it is plain that the right to use one's property for the sole purpose of injuring others is not one of the immediate rights of ownership; it is not a right for the sake of which property is recognized by the law, but is only a more or less necessary incident of rights which are established for very different ends. It has been thought by respectable authorities, that even at common law the extent of a man's rights in cases like the present might depend upon the motive with which he acted. [Greenleaf v. Francis, 18 Pick. 117, 121, 122; See Carson v. Western Railroad, 8 Gray 423, 424; Roath v. Driscoll, 20 Conn. 533, 544; Wheatley v. Baugh, 25 Pa. St. 528; Swett v. Cutts, 50 N. H. 439, 447.]

''We do not so understand the common law, and we concede further, that to a large extent the power

to use one's property malevolently, in any way which would be lawful for other ends, is an incident of property which cannot be taken away even by legislation. It may be assumed, that, under our Constitution the Legislature would not have power to prohibit putting up or maintaining stores or houses with malicious intent, and thus to make a large part of the property of the Commonwealth dependent upon what a jury might find to have been the past or to be the present motives of the owner.

"But it does not follow that the rule is the same for a boundary fence unnecessarily built more than six feet high. It may be said that the difference is only one of degree; most differences are, when nicely analyzed. At any rate, difference of degree is one of the distinctions by which the right of the Legislature to exercise the police power is determined. Some small limitations of previously existing rights incident to property may be imposed for the sake of preventing a manifest evil; larger ones could not be, except by the exercise of the right of eminent domain. [Sawyer v. Davis, 136 Mass. 239, 243.]

"The statute is confined to fences and structures in the nature of fences, and to such fences only as unnecessarily exceed six feet in height. It is hard to imagine a more insignificent curtailment of the rights of property. Even the right to build a fence above six feet is not denied, when any convenience of the owner would be served by building higher. It is at least doubtful whether the act applies to fences not substantially adjoining the injured party's land. The fences must be 'maliciously erected or maintained for the purpose of annoying' adjoining owners or occupiers. This language clearly expresses that there must be an actual malevolent motive, as distinguished from merely technical malice. The meaning is plainer than in the case of statutes concerning malicious mischief.

[Commonwealth v. Walden, 3 Cush. 558. See Commonwealth v. Goodwin, 122 Mass. 19, 35.]

"Finally, we are of the opinion that it is not enough to satisfy the words of the act that malevolence was one of the motives, but that malevolence must be the dominant motive—a motive without which the fence would not have been built or maintained. A man cannot be punished for malevolently maintaining a fence for the purpose of annoying his neighbor, merely because he feels pleasure at the thought he is giving annoyance, or if he would maintain it for other reasons even if that pleasure should be denied him. If the height above six feet is really necessary for any reason, there is no liability, whatever the motives of the owner in erecting it. If he thinks it necessary, and acts on his opinion, he is not liable because he also acts malevolently.

"We are of opinion that the statute thus construed is within the limits of the police power, and is constitutional, so far as it regulates the subsequent erection of fences. To that extent, it simply restrains a noxious use of the owner's premises, and although the use is not directly injurious to the public at large, there is a public interest to restrain this kind of aggressive annoyance of one neighbor by another, and to mark a definite limit beyond which it is not lawful to go. [See Commonwealth v. Alger, 7 Cush. 53, 86, 96; Watertown v. Mayo, 109 Mass. 315; Train v. Boston Disinfecting Co., 144 Mass. 523; See, also, Talbot v. Hudson, 16 Gray 417, 423.]"

And in the case of Whitmire v. City of Buffalo, 118 Fed. 773, decided by the circuit court of the United States of the Western District of New York, was involved the validity of the same statute that was considered in the case of City of Rochester v. West, 164 N. Y. 510, before mentioned. The former court took the same views of the New York statute that was taken by the New York Court of Appeals in the latter case.

Because of the very great importance of the questions involved in this case, both to the public at large, and especially to the inhabitants of municipalities and to the real estate owners therein, I have reviewed and carefully considered at some length all of the authorities cited by counsel for both parties to this suit, and, in addition thereto, several, I found, which I thought bore upon some of those propositions.

While the authorities are conflicting upon some of the questions presented and discussed, yet it may be fairly said that all of them agree upon the following legal propositions:

First, that municipal corporations, even under their general police powers, may, by ordinance, exercise reasonable control over the construction and maintenance of billboards, house signs and sky signs.

Second, that said power to regulate said matters begins where the public safety, health, morals and good government demand such regulation, and ends where those public interests are not beneficially served thereby.

And, third, that the mere unsightliness of billboards and of similar structures, as well as their failure to conform to aesthetics, is no valid reason for their total or partial suppression.

But the division of the courts, as is often the case, was brought about in the application of those rules of law to the facts of concrete cases. Some of them were of the opinion that the ordinance as applied to a particular case was unreasonable, or was not necessary for the public safety, etc., in that particular case; while other courts were of the opinion that similar ordinances, equally drastic, were reasonable and necessary.

In our opinion the latter cases are based upon more solid ground and are supported by better reason, though not by the greater weight of authority,

if we determine weight by the number of adjudications, upon that subject.

By reading the cases which held the ordinances invalid, it will be observed that they either failed to give any reason whatever for so holding, but contented themselves by simply stating that they were unreasonable and unnecessary, and, therefore, they were violative of both the State and Federal Constitutions, which prohibit the taking of private property for public use without just compensation; or, when they assigned a reason for holding the ordinance void, the reason stated was either that the ordinance was class legislation and did not embrace all structures in the city of similar character, as was especially true in the case of Bryan v. Chester, supra, or that the ordinance upon its face disclosed the fact that it was enacted solely for aesthetic purposes, and not for the good of the city.

In our opinion that class of cases which hold the ordinances invalid without assigning any reason for saying that they were unnecessary or unreasonable are entitled to but little weight in the consideration of such questions, for the reason that, in our judgment, they invade the legislative domain of the State, which is prohibited by the Constitution, and for the further reason that the courts, as a rule, are not as good judges of the necessity for or reasonableness of laws as are the lawmakers, who are elected by the people themselves. It is the opinion of most publicists that the administration of the law does not afford to those engaged therein the same advantages and broad opportunities to judge of the necessity, wisdom and reasonableness of laws as do the experience of the people, who live under those laws, which are but the reflection of their wishes regarding the various matters covered thereby.

We are also of the opinion that those cases which hold such ordinances to be void because they were

class legislation are also unsound, for the reasons before stated, that billboards, house signs and sky signs belong to a class unto themselves, and when they alone are named in an ordinance, there are no other structures of similar character to be found in the city which could be reasonably included with them. While, as before stated, persons could build similar structures and not use them for advertising purposes, yet it is sufficient to say that they have not as yet done so, and in all probability they will never do so, as we are unable to conceive any other use to which they could be adapted; but, be that as it may, we will not decide that question until such a case is presented to this court for determination.

As to the third class of cases, that is, those which hold such ordinances invalid because they show upon their faces that they were enacted solely for aesthetic considerations and not for the good of the public, they are unquestionably sound; and no court should uphold an ordinance which has no better reason than that to commend it to the lawmaker and the courts. If the necessity or reasonableness of such an ordinance should be tested by such a standard, then the standard itself would be hard to establish, for the reason that all do not have the same tastes or ideas of beauty; what would please one might not please another. In fact, tastes and ideas of beauty are as varied as are the leaves upon the tree—no two are alike and thousands are dissimilar. A statute or ordinance conforming to the tastes and ideas of beauty passed by the body of lawmakers who enacted it might and probably would in most instances be distasteful to a majority of the people of the city; and especially is that true as regards this class of legislation. The matters which would most likely be the subjects to this class of legislation are, as a rule, more pleasing to those who are far removed therefrom than they are to those who reside near them and who are subjected to their

annoyance and inconvenience. In all such cases distance lends enchantment to the view; also softens and adds sweetness to the rythmic sounds of industrial bells, as well as dissipates the noxious gases and offensive odors incident to such institutions. Property rights should never be subjected to such fickle standards of regulation, especially when they are devoid of all substantial benefit to the citizens.

There is another class of cases which, in our opinion, announced the correct rule as regards the reasonableness and unreasonableness of this class of ordinances. That rule is, that all ordinances must be held valid by the courts except, first, where the unreasonableness appears upon the face of the ordinance itself; and, second, where the evidence introduced clearly shows that the ordinance is in fact unreasonable. This direct question was before this court in the case of City of St. Louis v. St. Louis Theater Co., 202 Mo. 690. Graves, J., there, in speaking for the unanimous court, said:

"Then progressing to the next point, is the evidence in this record sufficient to show, *aliunde,* that the ordinance is invalid on the ground of being unreasonable. To which we reply, no. There is no evidence tending to show the ordinance unreasonable, except that by means of this illuminated sign, people were lighted into and out of the defendant's place of business. There was no evidence that there was a failure in this regard upon the part of the city, and even this would not authorize a violation of an otherwise valid ordinance. Unless the unreasonableness of the ordinance is apparent upon the face thereof, the burden is upon the person asserting it to be unreasonable to so show by the facts. These facts have not been developed in this case. There may be facts as to the conditions and surroundings of this place and this street which would show there had been an unreasonable exercise of the city legislative powers by the

terms of this ordinance, but they do not appear in the record. We cannot take judicial notice of the conditions of the place and street upon which this sign was located, nor can we take judicial notice of the public requirements and necessities at such place and on such street. Ordinances may be unreasonable on one state of facts and reasonable upon another. The same ordinance may be held to be reasonable and valid in its application to some streets and void on the ground of being unreasonable in its application to other parts of the city highways. [Railroad v. Jersey City, 47 N. J. L. 286.]

"To our mind the party attacking the validity of an ordinance upon the ground of its unreasonableness, must clearly show the facts, before the courts can act. The width of the street is not shown. The character of the public use thereof is not shown. The limits of the public necessities and requirements are not shown. Under such state of facts we cannot say that an ordinance is unreasonable. It follows that this contention of the defendant must be ruled against it." See, also, State v. Layton, 160 Mo. l. c. 498; Mugler v. Kansas, supra; McQuillin, Municipal Ordinances, 186, and cases cited.

In the case at bar there is nothing appearing upon the face of the ordinance under consideration which shows that it is unreasonable, nor does the evidence introduced at the trial of the cause tend to show that it was unreasonable; but, upon the contrary, the face of the ordinance itself, as well as the evidence, *aliunde,* clearly show that the ordinance was not only reasonable in its provisions, but that it was highly necessary to protect public safety, health, morals and well-being of the city.

We are, therefore, of the opinion that said ordinance is not invalid for any of the reasons considered, and that it does not deprive plaintiff of its property right for public use without just compensation.

III. This brings us to the consideration of the second constitutional objection made by plaintiff to this ordinance—namely, that said ordinance deprives plaintiff of its property without due process of law.

We will answer this objection in the language of this court as used in the case of City of St. Louis v. Galt, 179 Mo. 1. c. 16.

"Section 20 of article 2 of our Constitution prohibits the taking of private property for private use, with or without compensation, without the consent of the owner, except for private ways of necessity, or for drains for agricultural or sanitary purposes. The defendant invokes this guaranty.

"The apparent infirmity underlying this contention is that the ordinance does not take or authorize any one to take the defendant's property, but only regulates his use of the property so as not to injure others. The same contention was held to be untenable in Green v. Savannah, 6 Ga. 1. c. 13, where a city ordinance forbidding the growing of rice within the limits of the city of Savannah, was held to be within the police power conferred upon the city by the State.

"The ordinance in question, therefore, does not violate the Constitution of Missouri.

"The fifth amendment to the Constitution of the United States, invoked by the defendant, prohibits the taking of private property for public use without just compensation, and provides that no person shall be deprived of life, liberty or property without due process of law.

"Enough has already been said to show that the defendant is not deprived of his property for public use, or at all, and therefore he is not within the protection of the Federal Constitution in this regard."

We are, therefore, of the opinion that there is no merit in this objection.

IV. The third and last objection urged by plaintiff against this ordinance is, that it discriminates against plaintiff and denies to it the equal protection of the law.

This objection was considered in paragraph two of this opinion in connection with the contention that this ordinance deprived plaintiff of its property without just compensation. We there held that the ordinance was not class legislation because it embraced within its provisions all structures of the class or character existing in the city limits, and for that reason it could not be discriminatory against plaintiff, or its property. This objection is also without merit.

V. It is practically conceded by counsel for plaintiff that neither section 2 nor 178 of the ordinance has any reference to signs or billboards, and was not covered by the decree below.

They are, therefore, not involved in this appeal, and they will receive no further consideration. However, something was said during the oral argument about fences belonging to the same class of structures to which billboards belong, but that is so obviously incorrect that it deserves no refutation at our hands.

VI. Plaintiff assails the validity of this ordinance for the reason stated, that the fees charged or the cost of a permit for the erection of the various structures mentioned therein, as well as for permits to repair same, are unreasonable and confiscatory.

In the absence of any showing to the contrary, the courts must presume the Municipal Assembly investigated that matter and ascertained what sums were reasonable and just in the premises, and, after doing so, fixed those sums as reasonable charges by the ordinance in question. [See City of St. Louis v. St. Louis Theater Co., supra; State v. Layton, supra; McQuillin on Municipal Ordinances, sec. 186.] We, therefore, rule this point against plaintiff.

St. Louis Gunning Co. v. St. Louis.

There are several other minor questions presented and discussed by counsel for both plaintiff and the defendants, but all of them are subsidiary to and depend upon those decided, and the disposition of the former disposes of the latter as incidents thereto.

We are, therefore, of the opinion that the judgment should be reversed, and the peremptory injunction issued by the circuit court should be dissolved and for naught held; and it is so ordered.

All concur, except *Graves, J.,* who dissents.

## IN BANC.

PER CURIAM.—The foregoing opinion of WOODSON, J., delivered in Division No. 1, reversing the judgment of the circuit court, is adopted by the Court in Banc, with the following additional paragraph, to-wit:

We do not wish to be understood as passing upon the validity of that section of the ordinance under consideration, prescribing the license fees to be charged for the permission to erect billboards, house signs, etc., for the reason that it is not properly before this court for determination.

All concur except *Graves, J.,* who dissents in a separate opinion.

## DISSENTING OPINION.

GRAVES, J.—I do not concur in the majority opinion, because so to do, is, in my humble judgment, lending sanction to the confiscation of private property for aesthetic purposes. However aesthetic may become our tastes, there is no reason for striking down the constitutional rights to own and use private property, so long as such ownership and use does not do violence to public safety, public health, public morals, or to the broader term "general welfare."

Under the police power, the State and the different agencies of the State may provide reasonable rules for

the preservation of the public safety, the public health, the public morals, and the general welfare, although such rules, regulations, laws or ordinances may in a way trespass upon the absolute use and ownership of private property. This constantly increasing and indefinable power (the police power) has never yet been determined to be the special champion of aesthetic tastes. In this sphere of action it has been denied admission. Upon this point, Chief Justice VICKERS for the undivided Supreme Court of Illinois, in the case of Haller Sign Works v. Physical Culture Training School, 249 Ill. 463, has well said: "The courts of this country have with great unanimity held that the police power cannot interfere with private property rights for purely aesthetic purposes." The cases are so thoroughly reviewed by the Illinois Court, that we refer to that opinion for a collation and analysis thereof. But a slight examination of the subject shows that it has remained for civic leagues, rather than the courts, to contend that the police power may be extended to pure aesthetic considerations. Whenever the present case is analyzed, we believe it will be seen that there has been an unwarranted extension of the police power. The ordinance in question strikes at private property far beyond the usual rule for the exercise of the police power.

To my mind, the ordinance strikes at the use of a structure rather than the character of the structure. This I gather from the very definition of a billboard as given in the ordinance. By the legislative definition we are bound. The ordinance says: "The term *billboard* within the meaning of this section shall include all structures of *whatever material* the same may be constructed, which are erected, maintained or *used for the public display of posters, painted signs, pictures or other pictorial or reading matter,* except that the term *billboard* shall not be applied to such signs as

are attached to the roofs or walls of buildings, as provided for in section eighty-one of this ordinance.''

Observe the language, ''*all structures, of whatever material . . . which are erected, maintained, or used for the public display of posters,*'' etc.

If this definition does not condemn the structure ''of whatever material'' upon the sole ground of the use to which it is to be put, rather than upon the fact of its being safe, then I have studied English awry. If this definition has reference to public morals, I fail to see it. If it refers to public health, I fail to see it. If it refers to public safety or the general welfare, I fail to see it.

Yet the lawmaking power of St. Louis has said to this court by its own definition what structure it had in mind. It hasn't said a word in the definition about public safety, public health, public morals or general welfare, the only wards of the police power. Instead of so doing it has adopted the aesthetic view of a civic league or confederation of civic leagues, and undertakes to condemn structures on the basis of the use to which they are to be put.

The use of safe, private structures for advertising purposes is a lawful use. Such lawful use cannot be stricken down to please the eye. Of course, under the police power the character of the advertising could be scrutinized. Further, the character of the structure as to public safety, health and morals may be regulated, but such are the limits of the police power.

To illustrate the ordinance under question, a few examples or supposed cases will not be out of order. If I own a corner lot twenty feet wide, I can maintain and put up a brick or stone wall on the building line, provided I do not use, or propose to use such brick or stone wall for the painting thereon of display signs or advertisements. If I build the same stone or brick wall and advertise my mercantile, real estate or other

235 Sup.—14

legitimate business thereon, I would have to tear it down. Counsel for the city in oral argument admitted as much. Such only serves to demonstrate that the ordinance strikes at the use of the structure rather than at the structure itself. In fact, the very words of the definition of billboards so indicate. In the illustration, the party owning the lot and building the brick or stone wall has the use of all his property and private rights are not invaded. In case he declared to the building commissioner that he expected to paint signs upon it, the right to use his property up to the building line is refused him. In both cases, the structures are safe. In both cases they are to be and are constructed of the same material. In both cases the public morals are equally well subserved. Nor do the cases differ as to the public health. Yet the building of one wall is permitted and the other refused, and this solely upon the question of use, which is the very life of the definition given in the ordinance. Strength of structures, safety of structures, healthfulness of structures are all made subservient to the aesthetic idea, that signs upon structures should not be permitted.

No one can read these ordinances in their entirety without being convinced that the thing stricken at is advertising by means of printed or posted signs. In every line can be seen the carefully prepared design to exterminate the business by arbitrary conditions and license fees and taxes. If the business was *malum in se,* such ordinances might stand, but not on the theory that the police power is broad enough to encourage the aesthetic tastes of a city, however large or small.

We shall not undertake to quote from the great mass of cases which are directly opposed to the majority opinion in this case, but will content ourselves with a few excerpts from some of the leading ones.

In Bryan v. Chester, 212 Pa. St. 259, the Supreme Court of Pennsylvania said: "Although the police

power is a broad one, it is not without limitation, and a secure structure which is not an infringement upon the public safety, and is not a nuisance, cannot be made one by legislative fiat, and then prohibited. [Yates v. Milwaukee, 10 Wall. 497; 1 Dill. on Munc. Corp., sec. 374.]   It is doubtless within the power of the city to prohibit the erection of insecure billboards or other structures, to require the owners to maintain them in a secure condition, and to provide for their removal at the expense of the owners in case they become dangerous.   Perhaps regulations may be made with reference to the manner of construction so as to insure safety, but the prohibition of the erection of structures upon the lot line, however safe they might· be, would be an unwarranted invasion of private rights.''

The Kansas Supreme Court, Crawford v. Topeka, 51 Kansas 762, thus expresses the rule: ''In what can the erection of a safe structure for advertising purposes endanger the public safety any more than a like structure for some other lawful purpose? . Although the police power is a broad one, it is not without limitation and a structure that is not an infringement upon the public safety, and is not a nuisance, cannot be made one by legislative fiat and then prohibited.  It is doubtless within the power of the city to prohibit the erection of insecure billboards or other structures, and to require the owners to maintain them in a secure condition, and to provide for their removal by the owner in case they become dangerous.  Regulations may be made with reference to the manner of construction, so as to insure safety, but the prohibition of the erection of structures designed for advertising purposes, however safe they may be, would be an unwarranted invasion of private right and is without legislative authority.''

In Fisher Co. v. Woods, 187 N. Y. 90, the court, among other things, said: ''But the Legislature cannot arbitrarily infringe upon the liberty or property rights of any person living under the Constitution, nor pre-

vent him from adopting and following any lawful profession, trade or industrial pursuit not injurious to the community that he may see fit; nor prevent him from making contracts with reference thereto. To justify the State in interposing its authority in behalf of the public, it must appear that the interest of the public generally, as distinguished from those of a particular class, require such interference and that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals. The Legislature may not under the guise of protecting the public interest, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The legislative determination as to what is a proper exercise of the police power is subject to the supervision of the court and in determining the validity of an act it is its duty to consider not only what has been done under the law in a particular instance, but what may be done and by virtue of its authority.''

And to the direct point involved in this ordinance, is the case of State v. Whitlock, 149 N. C. 542, where the Supreme Court of North Carolina said: ''It is undoubtedly within the power of the corporate authorities of the city of Asheville to prohibit the erection of insecure billboards or other structures along the edge of the public streets, or so near as to be a menace, to require the owners to maintain all structures so located in a secure condition, and to provide for inspection and removal at the owner's expense, if condemned as dangerous. The city authorities may also adopt regulations as to the manner of construction of billboards, so as to insure safety to the passers-by; *but the prohibition of structures upon the lot line, however safe they may be, is an unwarranted invasion of private right, and is so held to be by all the courts which have passed upon the precise question as we are now advised.* In the case of City of Passiac v. Paterson Bill Posting

Co., it is held that a city ordinance requiring that signs or billboards shall be constructed not less than ten feet from the street line is a regulation not reasonably necessary for the public safety and cannot be justified as an exercise of the police power. [72 N. J. L. 285; 111 Am. St. 676.] In support of the decision is cited Crawford v. Topeka, 51 Kan. 756, 20 L. R. A. 692, 37 Am. St. 323, and Commonwealth v. Boston Advertising Company, 188 Mass. 348, 69 L. R. A. 817, 108 Am. St. 494, cases directly in point. In that case the New Jersey court says: 'The very fact that this ordinance is directed against signs and billboards only, and not against fences, indicates that some consideration other than the public safety led to its passage.' The court attributes the adoption of the ordinance to aesthetic considerations, rather than to an exclusive regard for the public safety, and says: 'Aesthetic considerations are a matter of luxury and indulgence, rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation.' See, also, People v. Green, 85 App. Div. 400, 83 N. Y. Supp. 460; Bill Posting Co. v. Atlantic City, 71 N. J. L. 73. The ordinances considered by the Kansas, New Jersey, and Massachusetts courts are perhaps more nearly indentical to the one in question than in any other cases reported; but the same principles of law concerning the constitutionality of such ordinances are stated with force in Chicago v. Gunning System, 214 Ill. 628, as well as in Letts v. Kessler, 54 Oh. St. 73; Bostock v. Sams, 95 Md. 400; Bryan v. Chester, 212 Pa. St. 259, 108 Am. St. 870; and Koblegard v. Hale, 60 W. Va. 37, 116 Am. St. 868. In Bryan v. Chester, *supra,* the Supreme Court of Pennsylvania say, at page 262 of 212 Pa. St., 108 Am. St. 870: 'It is doubtless within the power of the city to prohibit the erection of insecure billboards or other structures, to require the owners to maintain them in a secure condition, and to

provide for their removal at the expense of the owners in case they become dangerous. Perhaps regulations may be made with reference to the manner of construction so as to insure safety, but the prohibition of the erection of structures upon the lot line, however safe they might be would be an unwarranted invasion of private right.' There is nothing in the case of Rochester v. West, 164 N. Y. 510, 53 L. R. A. 548, 79 Am. St. 659, relied on by the State, which conflicts with this view, as in that case the power of the city to regulate the height of billboards was the only question considered.''

When BROWN, J., for the North Carolina Court, said, as above quoted, "But the prohibition of structures upon the *lot line,* however safe they may be, is *an unwarranted invasion of private right,* and is so held by *all the courts* which have passed upon the precise question," he evidently spoke, from investigation of authorities, for such is the case law. It is not a random statement. The overwhelming weight of the case law is against the ruling of our court upon this question. The effect of our opinion is to hold that such structures must be fifteen feet from the lot line without any regard to the character of the structure. For the sake of the argument it might be granted that the city can regulate the height of the board, by specifying methods of construction, and say that there should be a vacant space at the bottom where that is necessary, but upon what theory can it be said that you must go back fifteen feet to erect it, provided a safe structure is to be erected? The city could say that such structures shall not be erected of inflammable material, or above a certain reasonable height and be made absolutely safe, but when it goes further, as in this case, it is a confiscation of private property pure and simple, and a violation of both the State and the Federal Constitutions.

The reasonable enjoyment of one's real estate is

a vested right, which cannot be interfered with arbitrarily. The constitutional guaranty of the protection of all private rights extends equally to the enjoyment and possession of lands, and arbitrary interference by the government, or by its authority, with the reasonable enjoyment of private land, is the taking of private property without due process of law. Such taking is violative of the Constitutions, both State and Federal. He who owns the soil, owns it to the sky and to the center of the earth, and he has the right to use it as he sees fit, so long as such use is not such as to cripple the special wards of the police power, which wards we have heretofore named.

The same question came up as to the building code of the city of Cleveland, and in the city court Judge McGannon rendered a written opinion in the case of City of Cleveland v. Giese et al. This is not a court of final resort, but we quote his language because it so aptly describes the conditions of the ordinances we have under consideration. After setting out the ordinances and some general discussion of the principles of law applicable, he says: "It remains to determine whether in view of these well recognized principles the Cleveland ordinance is valid. These questions are pertinent: Is the ordinance adapted to the ostensible object of securing public safety? Is it an attempt under the guise of police regulation to invade the rights of persons and property when it has no effect upon public safety? Under the pretense of safe guarding the lives and limbs of the people, is the real purpose to remove from public view those posters and advertisements which flaunt themselves before the public so as to become objectionable to public sentiment? Is it an appeal to the aesthetic taste of the people rather than the honest exercise of the police powers to safeguard the people? The ordinance limits the height of all billboards to 'four sheets and not more than ten feet over all.' Outside of the fire

limits it forbids the location of a billboard within fifteen feet of the street line, and also limits it to the building line of the next adjoining building. This is either an appeal to the aesthetic or is an attempt to keep the billboards from obstructing the view of adjoining property owners. Such limitation placed upon structures of a different character would be plainly illegal. As well might the Building Code provide that no one shall build a house nearer the street than the front line of his neighbor's buildings. The ordinance does not in any plain, appreciable and appropriate manner tend towards safeguarding the public against injury. Other structures similarly built and placed are not forbidden, but if they have paper or other material attached thereto with letters or illustrations painted or printed thereon they become billboards and are sought to be prohibited. It is not the material attached thereto with letters and illustrations painted or printed thereon that can in any event endanger the public safety. It is the material construction upon which the advertising matter is placed that possibly may become dangerous. It is said by the Supreme Court of North Carolina, 'It is an unwarranted invasion of private right and is so held to be by all the courts which have passed upon the precise question, as we are now advised.' "

The description here given is the case at bar from start to finish. The ordinances upon their face show that there is no honest attempt to exercise the police power for public safety, public health or public morals. As stated before, no one can read the drastic provisions of these ordinances without concluding that they strike at the paper upon the wall, rather than the wall itself. Under the guise of the police power it is sought to strike down a legal business, because the æsthetic notions of a city have reached a point where the use of private property is to give way to the idea of beautifying a city. Beautiful cities are to

St. Louis Gunning Co. v. St. Louis.

be desired, but the constitutional rights of citizens must not be trampled under foot to secure them. As long as the advertising .is not offensive to public morals, the structure cannot be condemned on the sole ground of its use.

As said by one of the judges in the numerous, but recent billboard cases, "An ordinance depriving any man of the unrestricted use of his property for the benefit of his neighbor is unconstitutional and void." So, too, it should be said of the general public, unless the use strikes at the wards of the police power.

In People ex rel. M. Weinberg Adv. Co. v. Murphy, 195 N. Y. 126, the New York Court of Appeals thus speaks to at least one point involved in the case at bar: "But the more serious objection to the ordinance is, in the fact that the absolute prohibition is wholly confined to sky signs, as they are defined therein. The physical danger to the public does not arise from the advertisements. The advertisement, announcement, or direction bears no relation to the safety of the structure itself. It is not the structure therefore that is prohibited. Would a structure of any description be more dangerous if it bore the words "Omega Oil"? Could a city enact and enforce an ordinance limiting the height of all buildings therein which are painted a particular color and leave unrestricted the height to which a building could be erected so long as it was unpainted or painted a color other than the particular one specified? Such an ordinance would bear evidence in itself that it was not enacted for any purpose within the police power. It appears from the ordinance in question that it was not erected in the interest of the public health, morals or safety, or to conserve the public peace, order, and general welfare, and the ordinance, so far as it relates to sky signs, is arbitrary and unauthorized."

So in the case at bar. It is not the structure which is prohibited, but the use of the structure. And

so too, in the case at bar, the ordinances upon their face bear evidence that they were not enacted in good faith for any purpose within the police power.    Under the ordinance in question one might erect a solid board fence of a certain height upon his lot line, but if after its erection  he concludes to advertise his business thereon, he must move it back fifteen feet.    Every line of the ordinances indicate the promulgation of æsthetic views, rather than the legitimate exercise of the police power.    In such case, the courts  should  not hesitate to condemn  the entire ordinance, unless we desire to face about and say that under the broad, indefinable police power private property can be taken for æsthetic reasons.    Courts so far have not gone thus far, nor am I willing to go so far.    The majority opinion does not in terms disclaim the general trend of authority upon this question, yet in effect it does so do.    Such opinion does not in terms say that a structure should be torn down because signs are painted thereon, yet in effect such is the holding.    Private property or the use of private property cannot be taken for any such purpose.    The Supreme Court of Massachusetts in Commonwealth v. Boston Adv. Co., 188 Mass. 348, has well expressed our views in this language:

"Probably no one would care at present to deny that without compensation 'the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country, essential to the safety, health, peace, good order and morals of the community.'  [Field, J., in Crowley v. Christensen, 137 U. S. 86 and 89.]   Beyond the purpose named there are many others of a public nature, the promotion of which may involve the taking or damaging of property of individuals, and as to which there may be the differences of opinion as to whether the State must afford compensation if such loss or damage is inflicted.

"One of them is the education of youth. Probably all will agree that judged by a fair standard the promotion of education stands upon a higher plane' than the promotion of æsthetic culture or enjoyment, and would the better justify the imposition of a burden without compensation. But no one would contend that the State could authorize the taking of land for a school house without providing compensation for the owner. In a very recent case, this court in dealing with a statute requiring street railway companies to transport school children at a reduced rate of fare has held that if it appeared that the enforcement of the act would cause expense which the carrier must bear or put upon other patrons, we should be obliged to hold that there was a taking of property without due process of law. [Commonwealth v. Interstate Consolidated Street Railway, 187 Mass. 436.] If the police power technically so called will not justify a taking of property without compensation to promote the education of youth, it cannot justify such taking for the promotion of merely æsthetic purposes.

"Therefore if the rules of the commission amount to a taking of property, as no compensation is provided, they cannot be held valid. The plain and intended purpose of the rule is to prohibit the use of land near public parks and parkways for advertising. This has come to be an ordinary and remunerative use of lands near largely travelled streets, parkways, public parks, railroads and other places frequented in numbers by the public. It is as natural a use of such lands as is the use of storefronts and show windows for the display of goods kept for sale, or for other modes of advertising. It resembles the placing of advertising pages on each side of the literary portion of a periodical, or the placing in street cars or railway stations of advertisements disconnected with the business of transportation. All these at present are usual, common and profitable uses of property, of

which every one sees daily numerous instances.

"In the opinion of a majority of the court the rules or regulations established by the commission so interfere with the use of property as to amount to a taking of property for public use, and, as no compensation is provided for, the rules are void, because obnoxious to the provisions of our Constitution."

Courts are not bound by mere forms. They should go to the substance and from that determine the legislative purpose. In Mugler v. Kansas, 123 U. S. 623, the United States Supreme Court has well said: "The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty, indeed are under a solemn duty, to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to these objects, nor is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

Many other cases could be cited, but we desist.

The ordinances before us have been drawn to obviate the appearance of evil, but those undertaking to tread forbidden pastures will leave their footprints. It is argued that they fall within the police powers of the city, yet the very definition given of a billboard bespeaks æsthetics, rather than public safety, public morals, public health or general welfare. They argue that upon their face they appear reasonable regulations, yet when read as a whole, it is apparent from the unreasonable restrictions placed that the purpose was the suppression of a lawful business rather than the reasonable regulation of structures. As before stated every provision of the ordinance, when read together, points to the confiscation of a business heretofore ad-

judged to be lawful, rather than the reasonable regulation thereof in the interest of public health, public morals, public safety or the general welfare. The majority opinion is a departure from the universal trend of authority. Billboard litigation has been frequent in the last few years, but no ordinances as drastic as the ones under consideration have been upheld by the courts.

I am likewise unable to concur in holding structures used for advertising purposes, responsible for the nuisances and wrongs which may be committed behind them. Nuisances and other wrongs are not committed behind a structure, because that structure happens to be used for advertising purposes. They are committed behind all kinds of structures, and structures used for all purposes. Neither the structure, nor the use to which it is put, can be regarded as the inducing cause of the commission of these wrongs. If nuisances or other wrongs are committed behind these or any other structures, the city has the power and should abate the nuisances and prevent or punish the wrongs. For this purpose it is not necessary to abate the structures.

Personally, I think these ordinances a direct blow at the constitutional right to own and use private property, so long as such use does not offend the wards of the police power. I believe the enforcement of the provisions, restrictions and prohibitions of these ordinances would constitute a taking of private property without due process of law and without compensation, and that the application of these ordinances only to structures used for the public display of advertising matter, renders them discriminatory to such an extent as to deny to those engaged in that lawful business the equal protection of the laws. I am, therefore, convinced that these ordinances clearly violate the provisions of both the State and the Federal Constitution.

With these views I felt constrained to dissent from my brother, and the importance of the questions suggested a written, rather than a silent dissent.